# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| In re: | Chapter 11 |
| HO WAN KWOK, *et al.*, | Case No. 22-50073 (JAM) |
| Debtors. | (Jointly Administered) |
| LUC A. DESPINS, CHAPTER 11 TRUSTEE FOR THE ESTATE OF HO WAN KWOK, | Adv. P. No. 23-05017 (JAM) |
| Plaintiff, | Re: ECF No. 124 |
| v. | |
| TAURUS FUND LLC; SCOTT BARNETT, AS TRUSTEE FOR TAURUS FUND LLC; and TAURUS MANAGEMENT LLC, AS TRUSTEE FOR TAURUS FUND LLC, | |
| Defendants. | |

## APPEARANCES

G. Alexander Bongartz
Douglass E. Barron
Paul Hastings LLP
200 Park Avenue
New York, NY 10166

and

Nicholas A. Bassett (argued)
Paul Hastings LLP
2050 M Street NW
Washington, D.C. 20036

Douglas S. Skalka
Patrick R. Linsey
Dennis M. Carnelli
Neubert, Pepe & Montieth
195 Church Street, 13th Floor
New Haven, CT 06510

*Counsel for Plaintiff Luc A. Despins, Chapter 11 Trustee for the Estate of Ho Wan Kwok, Movant*

Michael T. Conway (argued)
Lazare Potter Giacovas & Moyle LLP
747 Third Avenue, 16th Floor
New York, NY 10017

*Counsel for Defendants Taurus Fund LLC, Scott Barnett, Trustee for Taurus Fund LLC, and Taurus Management LLC, Trustee for Taurus Fund LLC, Respondents*

## MEMORANDUM OF DECISION AND ORDER
## GRANTING MOTION FOR SUMMARY JUDGMENT

Julie A. Manning, United States Bankruptcy Judge

## I.    INTRODUCTION

Before the Court is a motion for summary judgment (the "Motion for Summary Judgment" or "Motion") filed by plaintiff Mr. Luc A. Despins, in his capacity as Chapter 11 trustee (the "Trustee") for the bankruptcy estate of Mr. Ho Wan Kwok[1] (the "Individual Debtor").  (ECF No. 124.)[2]  The Trustee seeks summary judgment against defendants Taurus Fund LLC ("Taurus Fund"), Mr. Scott Barnett, and Taurus Management LLC ("Taurus Management"; together with Taurus Fund, collectively, the "Taurus Entities"; and, together with Taurus Fund and Mr. Barnett, collectively, the "Taurus Parties") on all three turnover claims of his complaint sounding in beneficial ownership and *alter ego*.  (*Id.*)  The gravamen of the complaint is that certain real property commonly known as 675 Ramapo Valley Road, Mahwah, New Jersey 07430 (the "Mahwah Mansion") is property of the Individual Debtor's estate – not Taurus Fund.  (ECF No. 1.)

---

[1]  "Kwok" is the Cantonese Chinese pronunciation of the Individual Debtor's family name. "Guo" is the Mandarin Chinese pronunciation of his family name.  In addition to "Ho Wan Kwok", the Individual Debtor is known as "Kwok Ho Wan", "Wengui Guo", "Guo Wengui", "Miles Kwok", and "Miles Guo", among other names and *aliases*.
[2]  References to the docket in this adversary proceeding will be styled "ECF No. __". References to the docket in the main case, *In re Kwok*, Case No. 22-50073 (JAM), will be styled "Main Case ECF No. __".

This memorandum of decision sets forth the Court's conclusions of law.  Fed. R. Bankr. P. 7052.  For the reasons set forth below, the Motion for Summary Judgment is **GRANTED**.

## II.    BACKGROUND

On February 15, 2022, the Individual Debtor filed a voluntary Chapter 11 petition in this Court.  (Main Case ECF No. 1.)  On June 15, 2022, presented with allegations related to the Individual Debtor's financial mismanagement and an alleged shell game involving numerous corporate *alter egos*, the Court entered a memorandum of decision and order appointing a Chapter 11 trustee to administer the Individual Debtor's bankruptcy estate.  (Main Case ECF No. 465.)  *In re Kwok*, 640 B.R. 514 (Bankr. D. Conn. 2022).  On July 8, 2022, Mr. Despins was appointed as the Trustee.  (Main Case ECF No. 523.)

On March 15, 2023, during an evidentiary hearing in a different adversary proceeding, the Individual Debtor's counsel informed the Court the Federal Bureau of Investigation (the "FBI") had arrested the Individual Debtor earlier that morning pursuant to an indictment filed in the United States District Court for the Southern District of New York and he would not be available to testify as ordered.  Among other things, the indictment alleged the Mahwah Mansion is a residence of the Individual Debtor procured with proceeds of securities and wire fraud.  (Sealed Indictment at 36, *United States v. Guo*, No. 23 Cr. 118 (AT) (S.D.N.Y. Mar. 6, 2023) (the "Criminal Action"), ECF No. 2.)

On July 11, 2023, the Trustee commenced this adversary proceeding by filing a complaint.  (ECF No. 1.)  The complaint contains the following claims:

> (i)      Pursuant to sections 541, 542, and 544 of title 11 (the "Bankruptcy Code"), the first claim seeks (a) declaratory judgement that the Individual Debtor is the beneficial owner of the Mahwah Mansion and, hence, it is property of his bankruptcy estate; and (b) on the basis of such declaratory judgment, an order requiring the Taurus Parties to turnover the Mahwah Mansion to the Individual Debtor's bankruptcy estate by delivering it to the Trustee.  (Complaint ¶¶ 68–73, ECF No. 1.)

3

(ii)    Pursuant to sections 541, 542, and 544 of the Bankruptcy Code, the second claim seeks (a) declaratory judgment that the Individual Debtor is the beneficial owner of Taurus Fund and, hence, Taurus Fund is property of the Individual Debtor's bankruptcy estate; and (b) on the basis of such declaratory judgment, an order requiring the Taurus Parties to turnover the membership interests in Taurus Fund to the Individual Debtor's bankruptcy estate by delivering such to the Trustee.  (*Id.* ¶¶ 74–80.)

(iii)    Pursuant to sections 541, 542, and 544 of the Bankruptcy Code, the third claim seeks (a) declaratory judgment that Taurus Fund is the *alter ego* of the Individual Debtor and, hence, its property is property of the Individual Debtor's bankruptcy estate; and (b) on the basis of such declaratory judgment, an order requiring the Taurus Parties to turnover Taurus Fund's property to the Individual Debtor's bankruptcy estate by delivering such to the Trustee.  (*Id.* ¶¶ 81–87.)

Pursuant to the terms of a partial settlement between the Trustee and the United States, if successful in this adversary proceeding, the estate will recover at least its attorneys' fees and costs plus an additional $1,000,000.00 from the proceeds of any sale of the Mahwah Mansion towards the payment of certain claims.  (ECF No. 98.)

Concurrently with the complaint, the Trustee filed an *ex parte* motion for a temporary restraining order.  (ECF No. 4.)  On August 1, 2023, the Court granted the *ex parte* motion and entered a temporary restraining order, which was later extended with consent from Taurus Fund and Taurus Management.  (ECF Nos. 17, 34.)  On August 20, 2023, pursuant to the terms of the temporary restraining order, the Taurus Parties filed a list of Taurus Fund's property.  (ECF No. 44.)

On August 24, 2023, the Court entered a preliminary injunction for the reasons stated therein.  (ECF No. 47.)  On August 31, 2023, upon the Taurus Parties' failure to insure the Mahwah Mansion, the Court entered an order modifying the preliminary injunction.  (ECF No. 58.)  On September 1, 2023, pursuant to the terms of the preliminary injunction as modified, the Taurus Parties submitted a copy of an agreement with a security services provider approved by the Trustee.  (ECF No. 59).  On September 6, 2023, the Taurus Parties submitted a declaration of

the security service provider indicating that security services had been hired and would abide by the terms of the preliminary injunction.  (ECF No. 61.)

On February 2, 2024, upon the consent of the parties, the Court entered an order staying this adversary proceeding pending the conclusion of trial in the Criminal Action.  (ECF No. 102.) At the time the stay order entered, fact discovery was scheduled to close on February 16, 2024. (ECF No. 99.)

On July 16, 2024, the Individual Debtor was convicted in the Criminal Action (Criminal Action, ECF No. 395) and subsequently the stay of this adversary proceeding was lifted (ECF No. 110).  On July 29, 2024, the Trustee requested a status conference because the Taurus Parties had informed him they would no longer pay for security services at the Mahwah Mansion.  (ECF No. 106.)  On July 30, 2024, a status conference was held.  During the status conference, the parties discussed the security services and real estate taxes.  On August 1, 2024, the Taurus Parties filed a statement indicating they would no longer pay for security services or real estate taxes.  (ECF No. 109.)  On August 7, 2024, the Trustee filed an emergency motion to pay the security service provider, real estate taxes, and other maintenance and upkeep costs of the Mahwah Mansion.  (Main Case ECF No. 3381.)  The Taurus Parties filed a response stating they did not object to the relief sought.  (Main Case ECF No. 3392.)  After a hearing held on August 13, 2024, the Court entered an order granting the emergency motion.  (Main Case ECF No. 3422; *see* Main Case ECF Nos. 3689, 4344.)

The same date as the hearing on the emergency motion, a status conference was held in the adversary proceeding to discuss scheduling after the termination of the stay.  During the status conference, the Trustee stated he did not need further discovery and his intent was to file a motion for summary judgment in short order, particularly given the costs the estate would incur

going forward with respect to the Mahwah Mansion.  The Taurus Parties did not appear at the status conference, previously stating they had a conflict in relation to the hearing on the emergency motion.  (Main Case ECF No. 3392.)  The Taurus Parties did not file any pleading prior to the status conference regarding scheduling in the adversary proceeding.  The Court stated it would consider a motion for summary judgment in the normal course of business.

On September 11, 2024, the Trustee filed the Motion for Summary Judgment.  (ECF No. 124.)  Attached to the Motion are a memorandum of law and a Local Rule 56(a)(1) statement of undisputed facts (the "L.R. 56(a)(1) Statement") (*id.*) and the Declaration of Douglass E. Barron (the "Barron Declaration") with attached exhibits (each a "Trustee Exhibit") (ECF No. 125).  On October 16, 2024, the Taurus Parties filed an objection to the Motion and attached thereto the Declaration of Michael T. Conway (the "Conway Declaration") with an attached exhibit ("Taurus Exhibit A"), the Declaration of Fahad Mohammed (the "Mohammed Declaration"), the Declaration of Scott Barnett (the "Barnett Declaration"), and a Local Rule 56(a)(2) counterstatement of undisputed facts (the "L.R. 56(a)(2) Statement").  (ECF No. 137.)  On November 6, 2024, the Trustee filed a reply (ECF No. 146) and the Declaration of Nicholas A. Bassett (the "Basset Declaration") with attached exhibits (each a "Trustee Reply Exhibit") (ECF No. 147).

In addition to filing the Motion for Summary Judgment, the Trustee sought to decrease the cost of maintaining the Mahwah Mansion by seeking authority to sell it prior to the resolution of the adversary proceeding.  On October 1, 2024, the Trustee filed a motion for authority to sell the Mahwah Mansion and retain the proceeds in a segregated fund pending the resolution of this adversary proceeding.  (ECF No. 134; Main Case ECF No. 3602.)  On October 21, 2024, the Taurus Parties filed an objection to the Trustee's motion, presenting a competing proposed order.

(ECF No. 138.)  On October 22, 2024, a hearing was held on the motion.  During the hearing, the parties reported they had reached a resolution on the motion except as to whether the proceeds of any sale should be segregated in an escrow account or in the Trustee's bank account.  (Oct. 28, 2024, Hr'g Tr. at 13:10–17:2, ECF No. 140.)  On October 29, 2024, the Court granted the Trustee's motion, resolving the sole issue remaining between the parties.  (ECF No. 142; Main Case ECF No. 3757.)  To date, the Mahwah Mansion has not been sold.

On November 19, 2024, a hearing was held on the Motion for Summary Judgment.  (*See* Nov. 19, 2024, Hr'g Tr., ECF No. 152.)  During the hearing, the parties advanced argument regarding, among other things, the Trustee's failure to timely respond to the Taurus Parties' requests for admission and the Taurus Parties' failure to mention the pending requests for admission upon the termination of the stay.  On December 3, 2024, the Court entered an order granting the Trustee's request to amend his responses to the requests for admission.  (ECF No. 155.)  Because the Taurus Parties had objected to the request on the basis that they did not conduct discovery in reliance upon the Trustee's deemed admissions to its requests, the Court granted the Taurus Parties an additional fifty-nine days for discovery and an opportunity to file a supplemental response regarding only newly discovered factual material.  (*Id.*)  The Court stated it would not entertain a surreply or post-hearing brief that raised or reargued legal arguments. (*Id.*)  At the conclusion of the hearing, the Court took the Motion under advisement

On February 7, 2025, the Taurus Parties filed a supplemental response to the Motion. (ECF No. 168.)  Attached to the supplemental response is the Supplemental Declaration of Michael T. Conway (the "Supplemental Conway Declaration") with attached exhibits (each a "Supplemental Taurus Exhibit") and the Declaration of Haoran He (the "He Declaration").  (*Id.*) On February 14, 2025, the Trustee filed a supplemental reply (ECF No. 169) and the

supplemental Declaration of Douglass E. Barron (the "Supplemental Barron Declaration") with attached exhibits (each a "Supplemental Trustee Exhibit") (ECF No. 170).

Upon review of the supplemental briefing, the Court concludes no additional hearing is necessary.  D. Conn. Bankr. L.R. 9014-1(m); Appendix M.  Accordingly, this matter is ripe for adjudication.

## III.    JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b).  This Court has authority to hear and determine this matter pursuant to 28 U.S.C. § 157(a) and the Order of Reference of the United States District Court for the District of Connecticut dated September 21, 1984.  The instant matters are statutorily core proceedings.  28 U.S.C. § 157(b)(2)(A), (E), (O).  The Court concludes its exercise of jurisdiction is not precluded by Constitutional concerns.  *Cf. Stern v. Marshall*, 564 U.S. 462, 487–99 (2011).

Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## IV.    SUMMARY JUDGMENT STANDARD

Upon a motion for summary judgment, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) *made applicable by* Fed. R. Bankr. P. 7056.

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see Nick's Garage,*

*Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114–15 (2d Cir. 2017) (citing *Anderson*).  While

a movant "bears the initial responsibility of informing the district court of the basis for its

motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any,' which it believes demonstrate the

absence of a genuine issue of material fact," a movant is not required to "support its motion with

affidavits or other similar materials negating the opponent's claim."  *Celotex Corp. v. Catrett ex

rel. Catrett*, 477 U.S. 317, 323 (1986).  Where the movant meets its factual burden, an "opponent

must do more than simply show that there is some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see Hicks v.

Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

　　　　Finally, to succeed on the motion, the movant must be entitled, upon the undisputed

material facts, to judgment as a matter of law – the judge, in ruling on the motion, is not acting as

a finder of fact.  *Anderson*, 477 U.S. at 250.  Summary judgment should enter "where the

evidence is such that it 'would require a directed verdict for the moving party.'"  *Id.* at 251

(internal citations omitted).

## V.    UNDISPUTED FACTS

### A.    Evidentiary Disputes

　　　　Before stating the undisputed facts for the purposes of resolving the Motion for Summary

Judgment, the Court addresses the parties' evidentiary objections.  The Taurus Parties raise

objections to the admissibility, authenticity, and foundation of certain Trustee exhibits.  The

Trustee objects to the Mohammed Declaration and seeks to strike the He Declaration.  The Court

will discuss the Taurus Parties' and Trustee's objections in turn.

### 1.    Trial Testimony and Exhibits

In the L.R. 56(a)(2) Statement, the Taurus Parties note objections without elaboration, simply stating, for example, "Hearsay".  During the hearing, the Taurus Parties elaborated that they were objecting to trial transcripts from the Criminal Action as hearsay and testimony which was not subject to their cross-examination.  The Taurus Parties also object to exhibits from the trial in the Criminal Action as unauthenticated and lacking foundation.  In response, the Trustee argues (a) the Taurus Parties' arguments are waived under D. Conn. L. Civ. R. 56(a)(2)(i); (b) transcripts of testimony in other proceedings may be considered at summary judgment; and (c) the testimony authenticates the trial exhibits.

The Court agrees with the Trustee.  Courts may consider trial transcripts from other proceedings at summary judgment.  *Shulins v. New Eng. Ins. Co.*, 360 F.2d 781, 785 (2d Cir. 1966); *Kraft Gen. Foods, Inc. v. Cattell*, 18 F. Supp. 280, 284 (S.D.N.Y. 1998) (citing *Langston v. Johnson*, 478 F.2d 915, 918 n. 17 (D.C. Cir. 1973)).  Contrary to the Taurus Parties' argument, a trial transcript, just like an affidavit or declaration, may be considered even if the party opposing summary judgment was not able to cross-exam witnesses in the other action.  *Kraft Gen. Foods*, 18 F. Supp. at 284 (citing *United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 899 F. Supp. 974, 985 (E.D.N.Y. 1994)).  Hence, insofar as the testimony satisfies the requirements of an affidavit or declaration, the trial transcripts of the Criminal Action are properly before the Court at summary judgment.  *See* Fed. R. Civ. P. 56(c)(4).

With respect to authentication and foundation, "material relied on at summary judgment need not be admissible in the form presented.  Rather, so long as the evidence in question 'will be presented in admissible form at trial,' it may be considered on summary judgment."  *Smith v. City of New York*, 697 F. App'x 88, 89 (2d Cir. 2017) (summary order) (citing *Santos v.*

*Murdock*, 243 F.3d 681, 683 (2d Cir. 2001) (per curiam)); *see* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence").  The trial transcripts demonstrate the witnesses in the Criminal Action could be called to testify at trial to authenticate and provide foundation for the Trustee Exhibits.

Accordingly, the Court overrules the Taurus Parties' objections to the Trustee Exhibits. The Court need not reach the parties' arguments about waiver.

### 2.    Mohammed and He Declarations

The Trustee raises several objections to the Mohammed and He Declarations.  First, the Trustee objects to both the Mohammed and He Declarations on the basis that Mr. Mohammed and Mr. He were not disclosed to the Trustee.  The Court overrules this objection.  While the Taurus Parties do not appear to have timely disclosed Mr. Mohammed or Mr. He (Rule 26 Disclosures, **Tr. Ex. 20**), Rule 26 anticipates pre-trial disclosure of witnesses not included in initial disclosures or in supplemental disclosures.  *Compare* Fed. R. Civ. P. 26(a)(3)(A)(i), (B) *with* Fed. R. Civ. P. 26(a)(1)(A), (C); Fed. R. Civ. P. 26(e)(1).  The Taurus Parties are reminded of their ongoing disclosure obligations.

Second, the Trustee argues the Mohammed Declaration should be excluded because Mr. Mohammed lacks relevant personal knowledge and the content of the declaration is inadmissible hearsay.  The Taurus Parties argue Mr. Mohammed had access to relevant records and testified about the content of those records.

The Trustee's objection to the Mohammed Declaration is sustained.  "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to

testify on the matters stated." Fed. R Civ. P. 56(c)(4).  The Mohammed Declaration fails to meet this standard.  Mr. Mohammed declares he was not personally involved in the transactions at issue.  (Mohammed Decl. ¶ 1.)  Despite Mr. Mohammed's declared role at Hamilton Opportunity Fund SPC ("Hamilton Opportunity Fund"), the Mohammed Declaration is not an authentication declaration: none of the corporate records purportedly reviewed by Mr. Mohammed have been attached to his declaration or even affirmatively identified.  (*See, generally*, *id.*)  Instead, the Mohammed Declaration draws conclusions without personal knowledge of the transactions at issue based on unspecified documents that have not been presented to the Court and engages in argument with the Trustee's papers.  (*See, generally*, *id.*)  Mr. Mohammed would not be able to testify at trial as a fact witness and therefore his declaration as a fact witness cannot be considered at summary judgment.  Fed. R Civ. P. 56(c)(4); *see* Fed. R. Civ. P. 56(c)(2); *Smith*, 697 F. App'x at 89.  Accordingly, the Mohammed Declaration is excluded from consideration.

Third, the Trustee argues the He Declaration should be excluded because the Taurus Parties' supplemental response violates the Court's order.

The supplemental response itself will be stricken from the record.  "No sur-replies may be filed without permission of the Court, which may, in its discretion, grant permission upon a showing of good cause."  D. Conn. L. Civ. R. 7(d) *made applicable by* D. Conn. Bankr. L.R. 1001-1(b).  The Court's order is clear:

> **ORDERED:** On or before February 7, 2025, the Taurus Parties shall file a supplemental response to the Motion for Summary Judgment. The supplemental response shall only discuss factual material newly discovered between December 3, 2024, and January 31, 2025. The supplemental response is not a surreply.  It may not reargue any arguments advanced in the briefing on the Motion for Summary Judgment or during the hearing on the Motion for Summary Judgment . . .

(ECF No. 155.)  The supplemental response contains no new factual material.  Instead, in direct

contravention of this Court's order, it reargues arguments advanced in the briefing and during the

hearing.

However, the Court will not exclude the Supplemental Conway Declaration and its

attached exhibits or the He Declaration.  Despite determining there was no prejudice to the

Taurus Parties in allowing the Trustee to amend his responses to the requests for admission, the

Court gave the Taurus Parties the benefit of additional time to present factual material.  The

factual material the Taurus Parties provided will be considered.  Therefore, the Trustee's

objection is overruled.

### B.        Statement of Undisputed Facts

Upon review and consideration of (i) the L.R. 56(a)(1) Statement and L.R. 56(a)(2)

Statement; (ii) the Barron Declaration and attached Trustee Exhibits, the Bassett Declaration and

attached Trustee Reply Exhibits, the Supplemental Barron Declaration and attached

Supplemental Trustee Exhibits, the Conway Declaration with attached Taurus Exhibit A, the

Barnett Declaration, the Supplemental Conway Declaration and attached Supplemental Taurus

Exhibits, and the He Declaration; (iii) the record of this adversary proceeding; (iv) the record of

the jointly administered Chapter 11 cases and related adversary proceedings; and (v) other

matters of which the Court may take judicial notice, having ruled on the parties' evidentiary

disputes and unsealing material to the extent necessary to issue this Opinion and warranted under

section 107 of the Bankruptcy Code and precedent of the United States Court of Appeals for the

Second Circuit[3], the Court states the following undisputed facts:

---

[3]  Upon performing a particularized review of documents submitted in support of and in
opposition to the Motion for Summary Judgment, pursuant to the balancing test propounded by
the Second Circuit in *Brown v. Maxwell*, 929 F.3d 41 (2d Cir. 2019), the Court determines, to the

### *Parties*

1.      On February 15, 2022, the Individual Debtor filed a voluntary Chapter 11 petition

in this Court.  (Main Case ECF No. 1.)  In his statements and schedules, the Individual Debtor

listed $3,850.00 in assets and $373,803,498.09 in liabilities.  (Summary of Assets and Liabilities,

Main Case ECF No. 78.)  Presently, Proofs of Claim in an amount greater than

$18,000,000,000.00 have been filed against the Individual Debtor's estate.[4]  (Main Case Claims

Register.)  The Trustee has been appointed in the Individual Debtor's case.  (Main Case ECF No.

523.)

2.      Taurus Fund is a Nevada limited liability company.  (Initial List, List of Exhibits

Ex. 3, ECF No. 23 (admitted into evidence during hearing on preliminary injunction); *see* Aug.

14, 2023, Hr'g Tr. at 145:1–46:25, ECF No. 46; *see also* Rule 26 Disclosures ¶ 1) d), **Tr. Ex.

20**.)  Taurus Management is a New Mexico limited liability company.  (Certificate of

Organization, List of Exhibits Ex. 9, ECF No. 23 (admitted into evidence during hearing on

preliminary injunction); *see* Aug. 14, 2023, Hr'g Tr. at 152:11–53:21, ECF No. 46.)  Taurus

Management and Mr. Scott Barnett are listed as managers or managing members of Taurus

Fund.  (Articles of Organization, List of Exhibits Ex. 3, ECF No. 23.)

---

extent necessary to publish this unredacted Opinion, (i) the performance of the judicial function
requires the unsealing of the material previously sealed by orders (the "Sealing Orders") of the
Court (*see* ECF Nos. 16, 90, 130); and (ii) the strong presumption of public access to the material
submitted at summary judgment is not rebutted by the privacy and commercial information
interests in maintaining the sealing of the material, *Maxwell*, 929 F.3d at 47; *see* 11 U.S.C. §
107; *United States v. Amodeo*, 71 F.3d 1044, 1050–51 (2d Cir. 1995); *In re Purdue Pharma*, 632
B.R. 34 (Bankr. S.D.N.Y. 2021).

[4]  The Individual Debtor instructed his followers to file frivolous Proofs of Claim in his Chapter
11 case.  (*See* Main Case ECF Nos. 1399, 1440.)  Nevertheless, at this time none of the Proofs of
Claim have been disallowed in part or in their entirety.

3.      Taurus Fund is the title owner of the real property commonly known as 675 Ramapo Valley Road, Mahwah, New Jersey 07430, above defined as the "Mahwah Mansion". (Deed, List of Exhibits Ex. 9, at 4, ECF No. 23 (admitted into evidence during hearing on preliminary injunction); *see* Aug. 14, 2023, Hr'g Tr. at 151:4–52:6, ECF No. 46.)  The Mahwah Mansion is also commonly known as the "Crocker Mansion" or "Darlington".  (June 17, 2024, Crim. Trial Tr. at 2898:3–7, 2909:24–10:25 (Ms. Christine Frosini testifying), **Tr. Ex. 1**.)

### *Individuals and Entities Associated with the Individual Debtor*

4.      As set forth in detail below, several individuals associated with the Individual Debtor were involved in the purchase, renovation, or financing of the Mahwah Mansion or the creation or management of Taurus Fund, including without limitation:

(a)      The Individual Debtor's immediate family, including his wife, Ms. Hing Chi Ngok[5]; his daughter, Ms. Mei Guo; and his son, Mr. Qiang "Mileson" Guo;

(b)      Mr. Defeng "Wayne" Cao, the boyfriend of the Individual Debtor's daughter, Ms. Guo (Oct. 20, 2023, Depo. Tr. at 65:11–66:9 (Mr. Cao testifying), **Tr. Ex. 62**) who refers to the Individual Debtor and his wife as, respectively, "dad" and "mom" (*id.* at 109:25–110:3);

(c)      Attorney Aaron Mitchell, an attorney with the firm Lawall & Mitchell, LLC, ("Lawall & Mitchell"), who has, among other things, served as the Individual Debtor's personal attorney and represented the Individual Debtor's family members as well as numerous companies associated with  the Individual Debtor (Notice of Appearance, Main Case ECF No. 530; Nov. 25, 2021, Letter at PromProp 000038; **Tr. Ex. 2**; Consent to Change Attorney, **Tr. Ex. 10**; Consent to Change Attorney, **Tr. Ex. 18**; Stipulation, **Tr. Ex. 19**; July 8, 2024, Crim. Trial Tr. at 5514:15–20 (Mr. Barnett testifying), **Tr. Ex. 22**; Aug. 24, 2022, Letter, **Tr. Ex. 50**) and used the same address, 162 East 64th Street, New York, New York[6], as numerous of the Individual Debtor's shell companies (June 11, 2024, Crim. Trial Tr. at 2060:13–20, 2151:9–21 (Mr. Haitham Khaled testifying), **Tr. Ex. 4**; Consent to Change Attorney, **Tr. Ex. 10**);

---

[5]  Ms. Ngok is sometimes referred to as Mrs. Guo in the factual material submitted to the Court. As noted above, "Guo" is the Mandarin Chinese pronunciation of the Individual Debtor's family name while "Kwok" is the Cantonese Chinese pronunciation.  *See* n. 1, *supra*.
[6]  Frequently referred to as the "townhouse" during the trial in the Criminal Action.  (June 10, 2024, Crim. Trial Tr. at 1916:10–17:10 (Mr. Haitham Khaled testifying), **Tr. Ex. 65**.)

(d)     Mr. Kin Ming "William" Je, the Individual Debtor's "finance person" who "would handle the investments and financing for" the Individual Debtor (May 29, 2024, Crim. Trial Tr. at 458:18–22 (Ms. Karin Maistrello testifying), **Tr. Ex. 98**);

(e)     Ms. Yanping "Yvette" Wang, a top manager for the Individual Debtor who, among other things, oversaw management and operations of many of the Individual Debtor's shell companies at the Individual Debtor's offices at 162 East 64th Street, New York, New York (July 8, 2024, Crim. Trial Tr. at 5481:15–18; 5484:11–14 (Mr. Barnett testifying), **Tr. Ex. 22**; June 10, 2024, Crim. Trial Tr. at 1915:20–18:22, 1920:13–21:10 (Mr. Haitham Khaled testifying), **Tr. Ex. 65**);

(f)     Mr. Haitham Khaled, a banker who worked for, and provided financial services to, the Individual Debtor and his shell companies (June 10, 2024, Crim. Trial Tr. at 1941:21–42:1, 1945:4–46:20, 1976:6–77:1, 1977:8–16, 1990:1–10 (Mr. Haitham Khaled testifying), **Tr. Ex. 65**);

(g)     Ms. Ya Li, a follower of the Individual Debtor and a member of the Iron Blood Group, which took direct orders from the Individual Debtor and were the leaders of the Himalaya Alliance – a collection of social media "farms" that collected monies from supporters of the Individual Debtor – and managed its investment operations (June 5, 2024, Crim. Trial Tr. at 1316:8–15, 1316:21–17:15, 1373:5–76:6 (Ms. Li testifying), **Tr. Ex. 8**);

(h)     Ms. Gladys Chow, the Individual Debtor's personal assistant and translator (June 17, 2024, Crim. Trial Tr. at 2936:10–18 (Ms. Frosini testifying), **Tr. Ex. 1**; Dec. 19, 2021, WhatsApp Messages (transcribed), **Tr. Ex. 32**; Dec. 1, 2021, Email, **Tr. Ex. 36-2**, at 25; *see also* Sept. 11, 2023, Depo. Tr. at 3:11, **Tr. Ex. 12**);

(i)     Mr. Sean Jing, the Individual Debtor's personal assistant (July 8, 2024, Crim. Trial Tr. at 5523:3–23 (Mr. Barnett testifying), **Tr. Ex. 22**); and

(j)     Mr. Barnett, a defendant in this adversary proceeding who, among other things, provided security services for the Individual Debtor (July 8, 2024, Crim. Trial Tr. at 5416:1–6, 5480:5–9, 5480:24–81:2, 5481:12–24 (Mr. Barnett testifying), **Tr. Ex. 22**; *see also* Barnett Decl. ¶¶ 1, 4).

5.      As set forth in detail below, several entities associated with the Individual Debtor were involved in the purchase, renovation, or financing of the Mahwah Mansion or the creation or management of Taurus Fund, or had funds, employees, or property used by – or used funds, employees, or property of – Taurus Fund, including without limitation:

(a)     G Club Operations LLC ("G Club"), an entity that purported to offer concierge services to its members (June 18, 2024, Crim. Trial Tr. at 3106:4–07:11, 3200:4–24 (Ms. Limarie Reyes Molinaris testifying), **Tr. Ex. 52**);

(b)     Crane Advisory Group LLC ("Crane"), an entity that purportedly held G Club member payments in escrow for the benefit of G Club (*id.* at 3059:2–6; June 10, 2024, Crim. Trial Tr. at 1942:2–11, 1944:2–8, 1976:16–77:1, 1977:8–16, 1990:1–10 (Mr. Khaled testifying), **Tr. Ex. 65**);

(c)     Hamilton Opportunity Fund SPC (together with other, affiliated "Hamilton"-branded entities or funds, collectively, "Hamilton"), a fund nominally owned by Mr. Je (Register of Members, **Tr. Ex. 53**, at 61–62);

(d)     Golden Spring (New York) Ltd. ("Golden Spring"), and Lamp Capital, LLC ("Lamp Capital"), funds which employed the Individual Debtor's personal assistants and staff under the direction of Ms. Wang (June 10, 2024, Crim. Trial Tr. at 1935:9–17, 1958:22–25 (Mr. Khaled testifying), **Tr. Ex. 65**; *compare* July 8, 2024, Crim. Trial Tr. at 5416:1–6, 5480:5–9, 5480:24–81:2, 5481:12–24 (Mr. Barnett testifying), **Tr. Ex. 22** *with id.* at 5481:15–18, 5484:11–14);

(e)     HCHK Technologies, Inc. ("HCHK Technologies"), HCHK Property Management, Inc. ("HCHK Property"), and Lexington Property and Staffing Inc. ("Lexington"), entities which employed the Individual Debtor's personal assistants and staff under the direction of Ms. Wang (*compare* July 8, 2024, Crim. Trial Tr. at 5416:1–6, 5480:5–9, 5480:24–81:2, 5481:12–24 (Mr. Barnett testifying), **Tr. Ex. 22** *with id.* at 5481:15–18, 5484:11–14); and

(f)     Greenwich Land, LLC ("Greenwich Land"), an entity that owned the Individual Debtor's home located at 373 Taconic Road in Greenwich, Connecticut (the "Taconic Property") (June 10, 2024, Crim. Trial Tr. at 1958:7–59:17 (Mr. Khaled testifying), **Tr. Ex. 65**).

### *Purchase of the Mahwah Mansion*
### *Initial Showing of the Mahwah Mansion*

6.     In late November 2021, Attorney Aaron Mitchell, an attorney at Lawall & Mitchell, reached out to Ms. Christine Frosini, a real estate agent at Prominent Properties Sotheby's International Realty, about a client of Attorney Mitchell who wanted to view two properties: the Mahwah Mansion and another property in Hyde Park, New York.  (June 17, 2024, Crim. Trial Tr. at 2901:6–02:5 (Ms. Frosini testifying), **Tr. Ex. 1**.)  Ms. Frosini was retained as the prospective buyer's broker.  (*Id.* at 2900:22–24 (Ms. Frosini testifying).)

17

7.      On or about November 27, 2021, Attorney Mitchell provided Ms. Frosini with a proof of funds letter, dated November 25, 2021, which stated Lawall & Mitchell "represents Mei Guo and her family trust" and that Attorney Mitchell was "aware of Ms. Guo's financial wherewithal and can confirm that she is in funds to purchase the real estate in cash."  (Nov. 25, 2021, Letter at PromProp 000038, **Tr. Ex. 2**; Nov. 27–28, 2021, iMessage Text Chain at PromProp 000068, **Tr. Ex. 3**; *see* June 17, 2024, Crim. Trial Tr. at 2902:13–03:23, 2918:6–21 (Ms. Frosini testifying), **Tr. Ex. 1**.)  As noted above, Ms. Mei Guo is the Individual Debtor's daughter.

8.      On November 28, 2021, Ms. Frosini showed the Hyde Park property and Mahwah Mansion to the Individual Debtor and his wife, Ms. Hing Chi Ngok, who were accompanied by the Individual Debtor's driver and certain security personnel.  (June 17, 2024, Crim. Trial Tr. at 2905:25–06:04, 2906:17–23, 2908:10–14, 2913:7–10 (Ms. Frosini testifying), **Tr. Ex. 1**.)  Ms. Guo was not present for either of these showings.  (*Id.* at 2907:1–7, 2913:7–10 (Ms. Frosini testifying).)  The showing of the Mahwah Mansion lasted over an hour, and the Individual Debtor made comments regarding details of the home.  (*Id.* at 2913:15–2914:2 (Ms. Frosini testifying).)  The Individual Debtor inquired of Ms. Frosini whether there were any ghosts in the Mahwah Mansion.  (*Id.* at 2919:15–23 (Ms. Frosini testifying).)

9.      On the evening of November 28, 2021, after the showing, Ms. Frosini texted Attorney Mitchell to inform him that the seller had lowered the asking price for the Mahwah Mansion from $33,000,000.00 to $28,000,000.00.  (Nov. 28, 2021, iMessage Text Chain at PromProp 000070, **Tr. Ex. 3**; June 17, 2024, Crim. Trial Tr. at 2905:25–06:04, 2906:17–23, 2908:10–14, 2913:7–10 (Ms. Frosini testifying), **Tr. Ex. 1**.)  In response, Attorney Mitchell inquired about the reason for the price drop, specifically asking whether there was any "violent

history" or "stories of haunting" in connection with the property. (Nov. 28, 2021, iMessage Text Chain at PromProp 000070–71, **Tr. Ex. 3**.)

### *Individual Debtor's Offer to Purchase the Mahwah Mansion*

10.    The Individual Debtor referenced the price drop from $33,000,000.00 to $28,000,000.00 in a WhatsApp voicemail (the "Voicemail") he sent to Ms. Ya Li and asked her to translate. (Voicemail Transcription (Chinese), **Tr. Ex. 5**; Voicemail Transcription (English translation), **Tr. Ex. 6**; June 6, 2024, Crim. Trial Tr. at 1503:22–04:9 (Ms. Li testifying), **Tr. Ex. 7**.) Ms. Li transcribed the message and sent it back to the Individual Debtor when finished. (June 6, 2024, Crim. Trial Tr. at 1503:22–04:25 (Ms. Li testifying), **Tr. Ex. 7**.)

11.    The Voicemail was addressed to "Dear Anron" and Ms. Li understood "Anron" to be Attorney Mitchell. (Voicemail Transcription (English translation), **Tr. Ex. 6**; June 6, 2024, Crim. Trial Tr. at 1505:1–3 (Ms. Li testifying), **Tr. Ex. 7**.) Ms. Li's transcription and translation of the Voicemail contains a detailed offer from the Individual Debtor to purchase the property. (Voicemail Transcription (English translation), **Tr. Ex. 6**.) Among other things:

(a)    The Individual Debtor claimed: "I have just informed my family members about the property today, and also told them that the owner can reduce the price from $33Millon to $28Millon. Many of them know about this house and are very interested in buying it as an investment for the fund where we can host our family to live there, or sometimes we may also convert it to host our club members." (*Id.*) Ms. Li testified that when the Individual Debtor stated "we can host our family to live there", she understood that to mean that the property would be purchased for the Individual Debtor's family members to live there. (June 6, 2024, Crim. Trial Tr. at 1505:20–06:3 (Ms. Li testifying), **Tr. Ex. 7**.) She also testified she did not understand the reference to "club members" to mean that G Club members would be able to access the property at will, because "it's [the Individual Debtor's] family house", but to mean G Club members would be able to visit the Mahwah Mansion sometimes. (*Id.* at 1506:4–10.)

(b)    The Individual Debtor stated the terms of a counteroffer. (Voicemail Transcription (English translation), **Tr. Ex. 6**.) "The Family Fund offering the final price is $26Million to close this deal ASAP, ASAP, with the Fund. Please contact William, and use that fund to buy this." (*Id.*) Later in the Voicemail, the Individual Debtor reiterated "we can immediately prepare to sign the contract with $26 Million, and close

the deal as soon as possible" provided certain circumstances obtain and the seller agreed to certain terms.  (*Id.*)  Ms. Li testified she understood the Individual Debtor's reference to "William" was a reference to Mr. William Je (June 6, 2024, Crim. Trial Tr. at 1507:8–10 (Ms. Li testifying), **Tr. Ex. 7**), and understood the Individual Debtor's "Family Fund" to be "his entity", about which the Individual Debtor had said "[h]is Family Fund have a lot of money" (*id.* at 1506:11–19).

       (c)     The Individual Debtor stated "the Fund will put in $3 million to $5 million in renovation".  (Voicemail Transcription (English translation) ¶ 5, **Tr. Ex. 6**.)

       (d)     The Individual Debtor set forth several conditions on his counteroffer. (*See, generally*, *id.*)  Among other things, the Individual Debtor asked Attorney Mitchell to "[m]ake sure that the house has never had a cemetery or burial site in its history, and has never been any clash of cultures, for example, being haunted, burned or unlucky. The owner should promise that there are no secrets, including the history of the property, any unfortunate or preventable events, and the construction structure and safety of the house." (*Id.* ¶ 3.)

       (e)     The Individual Debtor stated his plans for a variety of renovation projects, including "convert[ing] an open-air, outdoor pavilion on the upper side of the courtyard into a new pavilion"; "add[ing] a lot of outdoor building lighting surrounding all buildings and courtyards" and "24 to 36 wall lamps to all corridors of each floor, and some ceiling lamps as well"; arrangements for the movement and future placement of furniture; a "transformation of the whole garden"; and renovation of the kitchen.  (*Id.* ¶¶ 5.a.–g.)

### Second Showing of the Mahwah Mansion

12.     On December 1, 2021, Attorney Mitchell asked Ms. Frosini via text message whether it would be possible for "the father to come back to the house tomorrow", and noted a "concern the mother had" that the air-conditioning was too loud.  (Dec. 1, 2021, iMessage Text Chain at PromProp 000075, **Tr. Ex. 3**.)  Ms. Frosini understood "the father" to be the Individual Debtor and "the mother" to be his wife.  (June 17, 2024, Crim. Trial Tr. at 2923:9–13, 2923:19–22 (Ms. Frosini testifying), **Tr. Ex. 1**.)  Ms. Frosini testified the Individual Debtor visited the Mahwah Mansion the next day, December 2, 2021, and "went through the house in more detail, every room".  (*Id.* at 2924:10–25:8.)

***Formal Offer to Purchase the Mahwah Mansion***

13.     On December 3, 2021, Attorney Mitchell emailed Ms. Frosini, attaching an offer

letter and asking whether "this work[s] to show interest/intent".  (Dec. 3, 2021, Email &

Attached Letter, **Tr. Ex. 9**, at 64–65.)  The letter, dated December 3, 2021, and printed on the

letterhead of Lawall & Mitchell, is addressed to Crocker Mansion Estate, LLC, ("CME") the

seller of the Mahwah Mansion, and states: "My client has authorized me to formally offer

$26,000,000.00 to purchase the Property.  This would be a cash deal.  Per your request closing

would occur on or before December 20, 2021."  (*Id.*)  Later in the day on December 3, 2021, Ms.

Frosini communicated to Attorney Mitchell CME had accepted the offer.  (Dec. 3, 2021,

iMessage Text Chain at PromProp 000078, **Tr. Ex. 3**.)

***Transmission of, and Comments to, the Mahwah Mansion Floor Plan***

14.     On the evening of December 3, 2021, Attorney Mitchell requested the floor plans

of the Mahwah Mansion from Ms. Frosini, stating, that "they were more focused on getting it

ready for their tastes."  (Dec. 3, 2021, iMessage Text Chain at PromProp 000078, **Tr. Ex. 3**.)

Ms. Frosini understood the "they" in Attorney Mitchell's text message referred to the buyers of

the Mahwah Mansion, whom she understood to be "the Guo family".  (June 17, 2024, Crim.

Trial Tr. at 2926:6–25 (Ms. Frosini testifying), **Tr. Ex. 1**.)  On December 4, 2021, Ms. Frosini

emailed the floor plans to Attorney Mitchell.  (Dec. 4, 2021, iMessage Text Chain at PromProp

000079, **Tr. Ex. 3**; *see also* June 17, 2024, Crim. Trial Tr. at 2936:4–9 (Ms. Frosini testifying),

**Tr. Ex. 1**.)

15.     On December 6, 2021, Ms. Gladys Chow, the Individual Debtor's personal

assistant and translator, emailed Ms. Frosini from her email account at HCHK Technologies.

(Dec. 6, 2021, Email, **Tr. Ex. 9**, at 1–5.)  In her email, Ms. Chow asked Ms. Frosini, among

other things, whether there were additional drawings of the Mahwah Mansion.  (*Id.*)  Ms. Chow

also attached the floor plans of the Mahwah Mansion Ms. Frosini had previously provided to

Attorney Mitchell, explaining she had "circled three areas on p.3 of the floor plan" and asking "if

we want to empty each one out and convert each of them into one single room, around how long

would it take?"  (*Id.*)

### *Signing of the Mahwah Mansion Purchase Agreement*

16.    Dated December 6, 2021, the purchase agreement (the "Purchase Agreement") for

the sale of the Mahwah Mansion lists CME as the seller and an entity named "Taurus Fund SP"

as the buyer.  (Real Estate Sales Contract at PromProp 000004–32, **Tr. Ex. 2**.)

17.    The AuthentiSIGN Signing Certificate associated with the Purchase Agreement

shows Taurus Fund SP signed the agreement via e-signature effected by Attorney Mitchell.

(Signing Certificate, **Tr. Ex. 13**; *see also* Letter of Engagement, **Supplemental Taurus Ex. B**.)

According to the Purchase Agreement, the total purchase price of $26,000,000.00, including a

$2,000,000.00 initial deposit, was to be paid to McDonnell & Whitaker LLC ("McDonnell &

Whitaker").  (Real Estate Sales Contract at PromProp 000005–06, **Tr. Ex. 2**.)  McDonnell &

Whitaker was counsel to CME in connection with the sale of the Mahwah Mansion.  (Nov. 30,

2021, Letter, **Tr. Ex. 14**.)

18.    The Purchase Agreement explicitly provides "[s]eller represents . . . that there are

no restrictions . . . that will prohibit use and/or occupancy of the Property as a **<u>single</u>** family

residential dwelling."  (Real Estate Sales Contract at PromProp 000016, **Tr. Ex. 2**.)  The word

"single" was filled in on a blank line in the Purchase Agreement.  (*Id.*)

*Retention of Buyer's Counsel*

19.    Attorney Amy Buck represented Taurus Fund as the buyer in connection with the purchase of the Mahwah Mansion.  (June 24, 2024, Crim. Trial Tr. at 3874:16–24 (Attorney Buck testifying), **Tr. Ex. 15**.)  In early December 2021, Attorney Buck received a call from Attorney Dara Lawall, Attorney Mitchell's wife and partner at Lawall & Mitchell.  (*Id.* at 3875:16–76:7.)  Attorney Lawall asked Attorney Buck if she could represent clients who "were like family to her and they were very important to them." (*Id.* at 3876:5–17.)  Attorney Buck accepted the engagement.  (*Id.* at 3881:16–17.)  Attorney Buck's primary contact was Attorney Mitchell, who held himself out as "the authorized representative for the Taurus Fund." (*Id.* at 3881:18–22.)

20.    On December 7, 2021, Attorney Mitchell signed Attorney Buck's engagement letter, dated December 6, 2021, as "Attorney-in-fact" on behalf of Taurus Fund SP.  (Dec. 6, 2021, Letter, **Tr. Ex. 16** (same document as **Supplemental Taurus Ex. C**); *see* June 24, 2024, Crim. Trial Tr. at 3882:11–84:10 (Attorney Buck testifying), **Tr. Ex. 15**.)  The engagement letter, addressed to Attorney Mitchell at Lawall & Mitchell, states: "This will confirm your engagement of this firm to represent Taurus SP as the Buyer" in connection with the purchase of the Mahwah Mansion.  (Dec. 6, 2021, Letter, **Tr. Ex. 16**.)

21.    After being engaged, Attorney Buck spoke to the title agency involved with the Mahwah Mansion purchase about whether an "SP" such as Taurus Fund SP could hold title to property.  (June 24, 2024, Crim. Trial Tr. at 3888:5–13 (Attorney Buck testifying), **Tr. Ex. 15**.)  After Attorney Buck informed Attorney Mitchell an "SP" is "not a recognized entity for title purposes in New Jersey" (*id.* at 3888:14–16), he told her that "they were going to form an LLC at closing" (*id.*)

### *Pre-Closing Inspection of the Mahwah Mansion*

22.     On December 8, 2021, Attorney Mitchell executed, as "Attorney for Taurus Fund SP", the pre-inspection agreement for the Mahwah Mansion.  (Dec. 8, 2021, Email Chain & Attached Agreement, **Tr. Ex. 9**, at 58–63.)

23.     On December 11 and 12, 2021, Attorney Mitchell and Ms. Frosini exchanged emails about an upcoming inspection at the Mahwah Mansion on December 13, 2021.  (Dec. 11–12, 2021, Email Chain, **Tr. Ex. 17**.)  Ms. Frosini asked Attorney Mitchell, "[o]n Monday, can they come at 11am to look at townhome first, then we will have lunch at the manor.  If he does not need to look at townhome, maybe Yvette can come at 11am."  (*Id.* at Aaron_Mitchell.307.)  In response, Attorney Mitchell wrote "Yvette can't be there at 11:00.  Also, (FYI) I was asked by the client to come again Monday."  (*Id.* at Aaron_Mitchell.306.)  When Ms. Frosini inquired how many people were coming for the inspection, Mitchell responded "5 for lunch."  (*Id.*)  Subsequent text messages on December 13, 2021, between Ms. Frosini and Attorney Mitchell show Attorney Mitchell, Ms. Frosini, Ms. Yvette Wang, and certain individuals whom Ms. Frosini referred to as "everyone" were at the property.  (Dec. 13, 2021, iMessage Text Chain at PromProp 000086, **Tr. Ex. 3**.)  Ms. Frosini understood Ms. Wang "worked with" the Individual Debtor.  (June 17, 2024, Crim. Trial Tr. at 2942:6–13 (Ms. Frosini testifying), **Tr. Ex. 1**.)

24.     In connection with the inspection and pre-closing process, Ms. Frosini referred to the "Guo family" as the "princip[al]" behind the transaction.  (June 17, 2024, Crim. Trial Tr. at 2944:12–23 (Ms. Frosini testifying), **Tr. Ex. 1**; *see also* Dec. 16, 2021, iMessage Text Chain at Prom 000092–93, **Tr. Ex. 3**.)

### *Formation of Taurus Entities and Closing of Mahwah Mansion Purchase*

25.      On December 15, 2021, Taurus Management was formed in New Mexico. (Certificate of Organization, List of Exhibits Ex. 9, ECF No. 23.)  In its Articles of Organization, Taurus Management lists its principal business address as 6628 Sky Pointe Drive, Suite 129-1071, Las Vegas Nevada 89131 (the "Nevada Address").  (Online Articles of Organization, List of Exhibits Ex. 9, ECF No. 23.)

26.      On December 16, 2021, Taurus Fund was formed under the laws of the State of Nevada with the assistance of Attorney Mitchell.  (Initial List, List of Exhibits Ex. 3, ECF No. 23; *see also* Rule 26 Disclosures ¶ 1) d), **Tr. Ex. 20**.)  Taurus Fund's Articles of Organization list Taurus Management and Mr. Barnett as its managers or managing members.  (Articles of Organization, List of Exhibits Ex. 3, ECF No. 23.)  The Nevada Address is listed as the address of all Taurus Parties.  (*Id.*)  Mr. Barnett signed the Articles of Organization.  (*Id.*)

27.      Also on December 16, 2021, CME executed the deed transferring ownership of the Mahwah Mansion to Taurus Fund.  (Deed and Realty Tax Fees, List of Exhibits Ex. 2, at 2–6, ECF No. 23.)  In the Affidavit of Consideration for Use by Buyer dated December 16, 2021, the property classification of the Mahwah Mansion is marked as "Class 2 – Residential." (Affidavit of Consideration for Use by Buyer, List of Exhibits Ex. 2, at 11, ECF No. 23.)

28.      Following the closing, Ms. Frosini texted Attorney Mitchell: "Please congratulate the buyers for me.  They are so nice and so is their staff."  (Dec. 2021, iMessage Text Chain at PromProp 000097, **Tr. Ex. 3**.)  Ms. Frosini testified during the trial in the Criminal Action that "the buyers" in her text message referred to the "Guo Family", and "their staff" referred to "the security guys" and "Yvette."  (June 17, 2024, Crim. Trial Tr. at 2946:6–17 (Ms. Frosini testifying), **Tr. Ex. 1**.)  Subsequently, Ms. Frosini sent Attorney Mitchell another text, stating

she would like to "get the buyers something" and suggesting "a nice holiday beautiful floral arrangement" but due to "the privacy factor", she did not "know if they would want [her] to send something to their CT home."  (Dec. 2021, iMessage Text Chain at PromProp 000097, **Tr. Ex. 3**.)

29.    Ms. Frosini testified, based on her interactions representing the buyer of the Mahwah Mansion, she understood the purpose of the buyer's Mahwah Mansion purchase was "for their home."  (June 17, 2024, Crim. Trial Tr. at 2950:1–6 (Ms. Frosini testifying), **Tr. Ex. 1**.)

30.    During an examination of Mr. Barnett during the Criminal Trial, the Individual Debtor's criminal defense counsel asked Mr. Barnett whether he was "surprised when Mr. Guo purchased that property", to which Mr. Barnett responded "[y]es", stating that "[i]t just didn't seem like his type of property."  (July 8, 2024, Crim. Trial Tr. at 5439:24–40:1, 5441:5–9 (Mr. Barnett testifying), **Tr. Ex. 22**.)

### *Furnishing and Renovation of the Mahwah Mansion*

31.    Mr. Defeng "Wayne" Cao, the boyfriend of the Individual Debtor's daughter, testified during his Bankruptcy Rule 2004 examination that he supervised construction and renovation at the Mahwah Mansion and slept there two to three nights per week.  (Oct. 20, 2023, Depo. Tr. at 107:14–108:12 (Mr. Cao testifying), **Tr. Ex. 62**.)

32.    During the trial in the Criminal Action, the United States admitted into evidence numerous WhatsApp voice message communications between the Individual Debtor and Ms. Chow.  (Stipulation Regarding Device Extraction, **Tr. Ex. 23**; *see* June 27, 2024, Crim. Trial Tr. at 4709:17–11:18, **Tr. Ex. 24**; *see also* Preliminary Device Report, **Tr. Ex. 25**; WhatsApp Voice & Video Messages (translated from Mandarin Chinese to English), **Tr. Exs. 26–33-2, 132–33**.)

The WhatsApp communications were recovered from an iPhone found in a bag on March 15, 2023, during a search conducted by the FBI at the Individual Debtor's residence at the Sherry-Netherland Hotel in New York, New York.  (Stipulation Regarding Device Extraction, **Tr. Ex. 23**.)  The WhatsApp Business account name for the iPhone is Miles GUO, and the user identification is 61404977207@s.whatsapp.net.  (Preliminary Device Report, **Tr. Ex. 25**.)  The WhatsApp communications contain, among other things, the following:

(a)    On November 30, 2021, the Individual Debtor sent Ms. Chow images of several light fixtures and a clock.  (Nov. 30, 2021, WhatsApp Messages (translated from Mandarin Chinese to English), **Tr. Ex. 26**; *see also* Attached Images, **Tr. Exs. 26-1–26-4**.)  Ms. Chow asked the Individual Debtor "Where are these going?  Is it New York?" (Nov. 30, 2021, WhatsApp Messages, **Tr. Ex. 26**.)  The Individual Debtor responded: "All'll be used in New Jersey, New Jersey, OK?"  (*Id.*; *see also* Audio File, **Tr. Ex. 26-7**; Translated Transcription, **Tr. Ex. 26-8**.)

(b)    On December 6, 2021, Ms. Chow sent a message to the Individual Debtor titled "House update message", in which she reported, among other things, she had inquired with the property manager and Ms. Frosini regarding curtain, carpet, cleaning, and landscaping companies.  (Dec. 6, 2021, WhatsApp Message (translated from Mandarin Chinese to English), **Tr. Ex. 27**.)  Ms. Chow updated the Individual Debtor on her communications with the Italian furniture and design company, Promemoria, raised issues regarding certain Baccarat crystal lamps, and asked the Individual Debtor if he had any alternative favorite brands given a French brand that he was interested in only had stores in France.  (*Id.*)

(c)    On December 7, 2021, the Individual Debtor sent Ms. Chow several images and videos of him marking up the Mahwah Mansion floorplan with a red marker, along with detailed instructions about how he wanted to change the floorplan of the mansion (Dec. 7, 2021, WhatsApp Messages (translated from Mandarin Chinese to English), **Tr. Ex. 28**; Attached Images, **Tr. Exs. 28-3, 28-6, 28-9, 28-12, 28-15, 28-22**; Video Files & Transcribed Translations, **Tr. Exs. 28-7–28-8, 28-10–28-11, 28-13–28-14, 28-16–28-21**) and what changes to make to "Guo Mei's bedroom", "Guo Mei's big bathroom", "Cao's room", "Guo Qiang's room", "Mrs. Guo's second floor", and "[Mrs. Guo's] bedroom" (Dec. 7, 2021, WhatsApp Messages (translated from Mandarin Chinese to English), **Tr. Ex. 28**; Video Files & Transcribed Translations, **Tr. Exs. 28-10–28-11, 28-13–28-14, 28-16–28-17**.)

(d)    On December 8, 2021, Ms. Chow sent the Individual Debtor the Instagram profile of an interior designer suggested by Ms. Frosini, and the Individual Debtor replied "[t]his designer is excellent, but is not enough.  What we want is that super and royal grade."  (Dec. 8, 2021, WhatsApp Message (translated from Mandarin Chinese to

English), **Tr. Ex. 29**; Audio File & Transcribed Translation, **Tr. Exs. 29-3–29-4**.) The Individual Debtor also sent Ms. Chow numerous additional mark ups of the Mahwah Mansion floorplan, frequently accompanied by detailed instructions on such matters as the placement of the kitchen stove and sinks and certain tables, the replacement of wooden stairs with glass stairs, the addition of security doors, the replacement of a window, and the layout of the rooms and dressing rooms for the Individual Debtor's daughter and son. (Dec. 8, 2021, WhatsApp Message (translated from Mandarin Chinese to English), **Tr. Ex. 29**; Attached Images, **Tr. Exs. 29-13–29-15**; Audio Files & Transcribed Translations, **Tr. Exs. 29-16–29-17**; (Dec. 8, 2021, WhatsApp Messages (translated from Mandarin Chinese to English), **Tr. Ex. 30**; Attached Images, **Tr. Exs. 30-1–30-3, 30-8–30-10, 30-13, 30-16**; Audio Files & Transcribed Translations, **Tr. Exs. 30-4–30-7, 30-11–30:12, 30-14–30-15, 30-17–30:18**.)

(e)     On December 14, 2021, the Individual Debtor sent Ms. Chow numerous images of carpets, rugs, and furniture in files labelled "for MG". (Dec. 14, 2021, WhatsApp Messages (translated from Mandarin Chinese to English), **Tr. Ex. 31**; Attached Images, **Tr. Exs. 31-1–31-3**.) Ms. Chow responded with images of items from several antique stores in New York, New York, including Solomon Treasure, RDM Fine Art, and Lev-Tov Antiques, referring to Solomon Treasure as the "1st antique store", "from which you decided to buy products". (Dec. 14, 2021, WhatsApp Messages (translated from Mandarin Chinese to English), **Tr. Ex. 31**; Attached Images, **Tr. Ex. 31-4**; *see also* Attached Images, **Tr. Exs. 31-5–31-7**.) The Individual Debtor responded with screenshots of certain images that were crossed out, along with a message that certain other pieces should not be purchased. (Dec. 14, 2021, WhatsApp Messages (translated from Mandarin Chinese to English), **Tr. Ex. 31**; Attached Images, **Tr. Exs. 31-8–31-9**; Audio File & Transcribed Translation, **Tr. Exs. 31-10–31-11**.) He also told Ms. Chow that two chairs could "be bought directly by the finance department." (Dec. 14, 2021, WhatsApp Messages (translated from Mandarin Chinese to English), **Tr. Ex. 31**.)

(f)     On December 19, 2021, Ms. Chow and the Individual Debtor sent voice messages back and forth regarding several renovation issues, including a photo in which Ms. Chow circled a wooden railing near the kitchen of the Mahwah Mansion. (Dec. 19, 2021, WhatsApp Messages (translated from Mandarin Chinese to English), **Tr. Ex. 32**; Audio Files & Transcribed Translations, **Tr. Exs. 32-1–32-6, 32-8–32-15**; Attached Image, **Tr. Ex. 32-7**.) In the background of the photo, the Individual Debtor can be seen standing in the kitchen of the Mahwah Mansion. (Dec. 19, 2021, WhatsApp Messages (translated from Mandarin Chinese to English), **Tr. Ex. 32**; Attached Image, **Tr. Ex. 32-7**.) The Individual Debtor responded with several comments about the kitchen, along with a link to a Louis XVI style giltwood center table, stating "[t]his table is 340,000. It can be bought after it's sure there's no problem with it." (Dec. 19, 2021, WhatsApp Messages (translated from Mandarin Chinese to English), **Tr. Ex. 32**; Audio File & Transcribed Translation, **Tr. Exs. 32-12–32-13**.)

(g)     Later that same day, December 19, 2021, the Individual Debtor instructed Ms. Chow regarding bedroom furnishings, stating "I want to order a pink bed for the room of Mrs. Guo . . . please check if there is any, my room is large, all king size, the

largest bed.  I need to buy a bed in my room.  Mrs. Guo, I want to buy a bed, and then buy a bed for the room of Guo Mei." (Dec. 19, 2021, WhatsApp Messages (translated from Mandarin Chinese to English), **Tr. Ex. 32**; Audio File & Transcribed Translation, **Tr. Exs. 32-14–32-15**.)

(h)    On December 22, 2021, the Individual Debtor sent Ms. Chow a video showing the image of a chandelier, asking "[d]idn't you ask him if he had any round ones?  Is it in stock?  And how big is the largest one." (Dec. 22, 2021, WhatsApp Messages (translated from Mandarin Chinese to English), **Tr. Ex. 33**, Video File & Transcribed Translation, **Tr. Exs. 33-1–33-2**.)

33.    Ms. Chow acted as an authorized representative in arranging for the payment of expenses at the Mahwah mansion, with a particular focus on higher end furnishings and artwork. (June 24, 2024, Crim. Trial Tr. at 3899:10–21 (Attorney Buck testifying), **Tr. Ex. 15**.)  In addition, Ms. Chow held the position of "Project Manager" at HCHK Technologies and used HCHK Technologies and Golden Spring email addresses. (*Id.* at 3899:22–900:4; *see, e.g.*, Dec. 1, 2021–Sept. 12, 2022, Email Chain at 24 of 22, **Tr. Ex. 36-2**, Jan. 20–26, 2023, Email Chain, **Tr. Ex. 37**, at 2.)

34.    Promemoria, a high-end Italian furniture and interior design company the Individual Debtor had previously engaged in connection with projects relating to his homes in Beijing and Hong Kong, his apartment in the Sherry-Netherland Hotel, and his yacht, the *Lady May*, was engaged to do work at the Mahwah Mansion.  (Jan. 16, 2024, Depo. Tr. at 19:25–36:4 (Mr. Paolo Sozzi testifying), **Tr. Ex. 36**.)  During his deposition taken on January 16, 2024, in this adversary proceeding, Mr. Paolo Sozzi testified Ms. Chow sent him an email on December 1, 2021, introducing herself as an "assistant of Mr. Miles Kwok" and referencing a "project . . . in a mansion in Mahwah, New Jersey". (*Id.* at 37:20–41:15, 43:19–44:14: Dec. 1, 2021–Sept. 12, 2022, Email Chain at 24 of 22, **Tr. Ex. 36-2**.)  Subsequently, Ms. Chow emailed Promemoria ideas for renovating parts of the Mahwah Mansion, which ideas Mr. Sozzi understood to be coming from the Individual Debtor.  (Jan. 16, 2024, Depo. Tr. at 59:3–20 (Mr. Sozzi testifying),

29

**Tr. Ex. 36**.)  Promemoria personnel visited the Mahwah Mansion and met with the Individual Debtor himself on multiple occasions, including at his office at 3 Columbus Circle, New York, New York, and his residence at the Taconic Property to discuss interior design for the Mahwah Mansion.  (*Id.* at 52:3–56:5, 63:24–64:8.)  Promemoria sent Ms. Chow an offer, dated February 2, 2023, and addressed to the Individual Debtor as "Mr. MK", which contemplated costs of €517,207.50 for the "daughter's room", €1,189,489.00 for the "mother's room", €841,731.00 for the "son's room", €940,234.00 for the kitchen, and €520,331.00 for the cinema room.  (Feb. 2, 2023, Letter, **Tr. Ex. 36-14**; *see* Jan. 16, 2024, Depo. Tr. at 92:16–94:4 (Mr. Sozzi testifying), **Tr. Ex. 36**.)  After the Individual Debtor's arrest, Mr. Sozzi sent an email to Ms. Chow on April 7, 2023, stating on behalf of Promemoria "[w]e read with great regret what happened to MK at this point we can consider definitively canceled the project."  (April 7, 2023, Email Chain, **Tr. Ex. 36-16**; *see* Jan. 16, 2024, Depo. Tr.  at 95:21–96:25 (Mr. Sozzi testifying), **Tr. Ex. 36**.)

35.     Mr. Evan Lobel, owner of the art and antique gallery Lobel Modern, testified during his deposition in this adversary proceeding conducted on January 12, 2024, about a masked client who visited his gallery in 2022 (Jan. 12, 2024, Depo. Tr. at 10:6–12:19 (Mr. Lobel testifying), **Tr. Ex. 35**) and who told Mr. Lobel "he had a large property in New Jersey" and "he wanted to buy high-quality investment pieces for his home" (*id.* at 13:23–15:7).  Mr. Lobel testified the client took pictures of items during his visit and told Mr. Lobel a member of his team would reach out about buying the items.  (*Id.* at 20:2–9.)  Ms. Leanne Li later emailed Mr. Lobel using a GFashion email address, and Ms. Chow thereafter joined the conversation using an HCHK Technologies email address but identifying herself as an employee of Golden Spring with an address of 162 East 64th Street.  (*Id.* at 25:11–24, 26:12–27:17, 37:4–20.)  Ms. Chow communicated with Mr. Lobel regarding signing a non-disclosure agreement and informed him

the purchases were to be billed to Taurus Fund and shipped to the address of the Mahwah Mansion. (*Id.* at 29:21–30:5, 36:10–37:3.) Mr. Lobel always understood Ms. Li and Ms. Chow "worked for the client", their "boss", the Individual Debtor. (*Id.* at 28:25–29:6, 44:8–25, 48:8–49:9.) Each of the invoices issued by Lobel Modern to Taurus Fund were paid through transfers from Attorney Buck's trust account. (Invoices, **Tr. Exs. 35-6, 35-8, 35-10, 35-13**.)

36. During his deposition in this adversary proceeding taken on January 11, 2024, Mr. Mordechai Talasazan, a representative of Solomon Treasure Antiques, was shown a photo of the Individual Debtor and stated the Individual Debtor bore a resemblance to a masked individual, wearing a hat and glasses, who visited Solomon Treasure in December 2021. (Jan. 11, 2024, Depo. Tr. at 12:14–13:2 (Mr. Talasazan testifying), **Tr. Ex. 34**.) Mr. Talasazan testified this individual, the "client", "came to our showroom to choose some pieces and left, and then we spoke with Gladys [Chow] after." (*Id.* at 14:12–15:10.) Mr. Talasazan described Ms. Chow, who communicated using her HCHK Technologies email address, as "the liaison . . . between this person[, *i.e.*, the client], and me." (*Id.* at 13:17–14:15.) As stated above, Ms. Chow noted in a December 14, 2021, WhatsApp message to the Individual Debtor that Solomon Treasure was the "1ˢᵗ antique store" "from which you decided to buy products." (Dec. 14, 2021, WhatsApp Messages (translated from Mandarin Chinese to English), **Tr. Ex. 31**; Attached Images, **Tr. Ex. 31-4**.) In an email to Mr. Talasazan, Ms. Chow stated that "the Principal" wanted to electrify certain torcheres purchased from Solomon Treasure, and Talasazan understood "the Principal" to be a reference to the "client." (*Id.* at 30:12–20, 31:12–20; Dec. 21, 2021–Jan. 3, 2022, Email Chain, **Tr. Ex. 34-6**, at 4.) The purchases from Solomon Treasure were invoiced to a "private client" located in Mahwah, New Jersey, and paid from Attorney Buck's trust account. (Jan. 11, 2024, Depo. Tr. at 32:14–39:18 (Mr. Talasazan testifying), **Tr. Ex. 34**; Aug. 16, 2022, Email

with Attached Invoice, **Tr. Ex. 34-7**, Feb. 13, 2022, Invoice, **Tr. Ex. 34-9**, Bank Statement

Excerpts, **Tr. Exs. 34-8, 34-10**.)

37.    During the trial in the Criminal Action, the United States introduced numerous

invoices and other documents into evidence relating to renovation of specific wings and rooms of

the Mahwah Mansion, including:

(a)    Communications between Ms. Chow and Promemoria, including the February 2023 Promemoria offer, discussed above, which communications refer to closets belonging to the Individual Debtor's wife, daughter, and son (Jan. 20–26, 2023, Email Chain, **Tr. Ex. 37**; Mahwah Mansion Floorplans, **Tr. Ex. 38**; *see* Stipulation Regarding Documents, **Tr. Ex. 58**; *see also* June 25, 2024, Crim. Trial Tr. at 4284:3–18);

(b)    A December 18, 2021, contract with LaBarbiera Custom Homes LLC for demolition work to be provided in the "2nd level ladies master wing", "3rd level sons wing", and "3rd level daughters wing" (Dec. 18, 2021, Contract, **Tr. Ex. 39**);

(c)    A February 15, 2022, invoice from D&D Antiques Gallery for various fine antiques to be placed "next to his bedroom on 2nd floor" and in "madame's living room next to her bedroom" (Feb. 15, 2022, Invoice, **Tr. Ex. 40**);

(d)    A February 21, 2022, invoice from Luca Inc. ("Luca") for work done in "Madam's bedroom" (Feb. 21, 2022, Invoice at Buck_Esq_SDNY_0000442, **Tr. Ex. 41**);

(e)    A February 23, 2022, invoice from Luca for installation of custom closet cabinets in "Boss's closet" (Feb. 23, 2022, Invoice at Buck_Esq_SDNY_0000441, **Tr. Ex. 41**);

(f)    A March 1, 2022, invoice from Luca for installation of custom closet cabinets in "2nd Madam closet" (Mar. 1, 2022, Invoice at Buck_Esq_SDNY_0000437, **Tr. Ex. 41**);

(g)    An April 20, 2022, invoice from Luca for the supply and installation of towel racks for the "boss bathroom" and the installation of closet rods in the "madam's laundry room" (April 20, 2022, Invoice, **Tr. Ex. 42**); and

(h)    An August 12, 2022, invoice from Tapestry Landscape Architecture as the "Cao Residence" (Aug. 12, 2022, Invoice, **Tr. Ex. 43**).

### *Funding the Mahwah Mansion Purchase and Renovation*

38.     During the trial in the Criminal Action, the United States presented and

introduced into evidence a demonstrative chart (the "Flow of Funds Chart"), set forth below,

describing the flow of funds for the purchase and renovation of the Mahwah Mansion:



(Demonstrative Charts at 19, **Tr. Ex. 51**.)  As shown in the chart and detailed below, (i) Crane

held member payments for G Club, which monies the Individual Debtor demanded be transferred

to Hamilton (*see* Undisputed Facts 39–46, *infra*); (ii) Lawall & Mitchell received monies from

Crane as counsel to G Club in an arbitration action, wherein G Club obtained an arbitration

award against Crane (*see* Undisputed Facts 46–47, *infra*); (iii) Lawall & Mitchell transferred the

monies obtained through the arbitration award to Hamilton Opportunity Fund (*see* Undisputed

Fact 48, *infra*); (iv) from these monies, Hamilton Opportunity Fund paid the deposit and closing

costs for the purchase of the Mahwah Mansion (*see* Undisputed Facts 49–50, *infra*); and (v) from

these monies, Hamilton Opportunity Fund transferred additional funds to Attorney Buck's trust

account, which she used to pay, among other things, invoices relating to the renovation of

Mahwah Mansion (*see* Undisputed Facts 52–53, *infra*).

### *Crane Advisory Group and the Transfer of G Club Monies*

39.    Crane acted as an escrow agent for G Club and would "receive member

payments" for G Club, a purported concierge service.  (June 18, 2024, Crim. Trial Tr. at 3059:2–

6, 3106:4–07:11, 3200:4–24 (Ms. Limarie Reyes Molinaris testifying), **Tr. Ex. 52**.)  Mr.

Haitham Khaled, the sole member of Crane, created Crane shortly after being hired by the

Individual Debtor, based on discussions with Ms. Wang and Attorney Victor Cerda, one of the

Individual Debtor's attorneys.  (June 10, 2024, Crim. Trial Tr. at 1942:2–11, 1944:2–8 (Mr.

Khaled testifying), **Tr. Ex. 65**.)  Following Crane's establishment, Mr. Khaled was paid by

Lexington and his employment contract was with Saraca Media Group, Inc. ("Saraca").  (*Id.* at

1943:3–9.)  Mr. Khaled referred to the Individual Debtor as "the top boss".  (*Id.* at 1941:21–

42:1.)

40.    Prior to Mr. Khaled starting his employment in 2020, Ms. Wang interviewed him

at 162 East 64th Street, New York, New York where he also met Attorney Mitchell.  (June 10,

2024, Crim. Trial Tr. at 1915:20–18:22 (Mr. Khaled testifying), **Tr. Ex. 65**.)  During the

interview, Ms. Wang told Mr. Khaled she worked for "the big boss principal".  (*Id.* at 1918:4–7.)

Afterwards, Mr. Khaled had a follow-up interview with the Individual Debtor, whom Ms. Wang

informed him was the "boss" and the "[p]rincipal" who would decide whether he was hired.  (*Id.*

at 1920:13–21:10.)

41.    Crane's official office address at One World Trade Center was a virtual office,

and Mr. Khaled continued to work out of the Individual Debtor's office at 162 East 64th Street.

(June 10, 2024, Crim. Trial Tr. at 1944:13–20, 1990:11–19 (Mr. Khaled testifying), **Tr. Ex. 65**.)

Similar virtual office addresses were established for Lexington, G Club, G Music, G News, and G Fashion (collectively, the "G Series Entities"). (*Id.* at 1946:23–47:3.) The virtual addresses were set up to achieve "dissociation between Saraca, GTV, and the news of Golden Spring." (*Id.* at 1949:14–17; *see also id.* at 1944:25–45:3, 1990:20–91:2.) Among other tasks, Mr. Khaled assisted in setting up banking accounts for such entities as Golden Spring, Hudson Diamond NY LLC, Lamp Capital LLC ("Lamp Capital"), and Greenwich Land LLC. (*Id.* at 1950:14–54:5, 1955:11–18, 1956:7–10, 1964: 6–13.)

42.    In addition to serving as an escrow agent for G Club, Crane was used to assist in opening bank accounts for Individual Debtor-controlled companies, and in that context Mr. Khaled represented he was merely a consultant when in fact "Crane was related to" the Individual Debtor's "G Series" entities and Mr. Khaled "was working for these entities." (June 10, 2024, Crim. Trial Tr. at 1990:1–10 (Mr. Khaled testifying), **Tr. Ex. 65**.)

43.    Mr. Khaled also represented to banks the Individual Debtor was merely a promoter of G Club and other G Series Entities, when in fact the Individual Debtor "was involved with the creation of the companies and the day-to-day operations." (*Compare* June 10, 2024, Crim. Trial Tr. at 1976:6–15 (Mr. Khaled testifying), **Tr. Ex. 65** *with id.* at 1977:8–16; *see, e.g.*, Emails, **Tr. Exs. 77–79**; *see also* June 10, 2024, Crim. Trial Tr. at 1945:4–46:20 (Mr. Khaled testifying), **Tr. Ex. 65**.) Mr. Khaled did not reveal the Individual Debtor's role to the banks because that would "jeopardize the possibility of opening up the account at the bank." (June 10, 2024, Crim. Trial Tr. at 1976:16–77:1 (Mr. Khaled testifying), **Tr. Ex. 65**.)

44.    Mr. Khaled testified during the trial in the Criminal Action that the Individual Debtor controlled the wire transfers Crane received for G Club and had a financial interest in those funds. (June 12, 2024, Crim. Trial Tr. at 2211:9–15 (Mr. Khaled testifying), **Tr. Ex. 66**.)

Mr. Khaled and others referred to the Individual Debtor as the "boss" or the "principal" in discussions regarding the disposition of funds held by Crane for G Club.  (Transcription of May 6, 2021, Audio File (including translation from Mandarin Chinese to English) at 8, 9, **Tr. Ex. 67**; Transcription of May 4, 2021, Audio File (including translation from Mandarin Chinese to English) at 10, **Tr. Ex. 68**; Transcription of April 28, 2021, Audio File (including translation from Mandarin Chinese to English) at 4, 11, **Tr. Ex. 69**; Audio Files, **Tr. Exs. 80–82**; *see also* June 10, 2024, Crim. Trial Tr. at 2003:20–06:10 (Mr. Khaled testifying), **Tr. Ex. 65**.)

45.    In these discussions, the Individual Debtor demanded the escrowed G Club funds held by Crane be "[i]mmediately" transferred to "William's foundation" and was furious G Club's internal counsel had not yet approved the transaction.  (Transcription of May 6, 2021, Audio File (including translation from Mandarin Chinese to English) at 3–6, **Tr. Ex. 67**; May 6, 2021, Audio File, **Tr. Ex. 80**.)  The Individual Debtor "want[ed] to move the money overseas". (Transcription of May 6, 2021, Audio File at 10 (including translation from Mandarin Chinese to English), **Tr. Ex. 70**, May 6, 2021, Audio File, **Tr. Ex. 83**; *see also* June 10, 2024, Crim. Trial Tr. at 2003:20–06:10 (Mr. Khaled testifying), **Tr. Ex. 65**.)  Other participants in these discussions understood the foundation to mean Hamilton.  (Transcription of May 6, 2021, Audio File at 9–10, 17–18 (including translation from Mandarin Chinese to English), **Tr. Ex. 70**, May 6, 2021, Audio File, **Tr. Ex. 83**.)  Despite being the CEO of G Club at the time, Ms. Limarie Reyes Molinaris did not participate in phone calls with the Individual Debtor regarding the funds held by Crane.  (June 18, 2024, Crim. Trial Tr. at 3104:21–23 (Ms. Reyes testifying), **Tr. Ex. 52**.)

46.    Mr. Khaled testified during the trial in the Criminal Action a dispute arose in July 2021 between Crane and G Club over delays in Crane's transfer of funds based on "a complaint

that money needs to be transferred now" and the Individual Debtor was one of the complainants. (June 11, 2024, Crim. Trial Tr. at 2034:20–35:14 (Mr. Khaled testifying), **Tr. Ex. 4**.)  G Club initiated arbitration proceedings against Crane related to, in Mr. Khaled's words, "about $50 million" received by Crane but not yet transferred to G Club.  (*Id*. at 2074:18–75:6.)  Ms. Reyes, the CEO of G Club at the time, testified she "did not have a role" in the decision to initiate arbitration proceedings against Crane.  (June 18, 2024, Crim. Trial Tr. at 3104:18–20 (Ms. Reyes testifying), **Tr. Ex. 52**.)

47.    The arbitration proceeding resulted in an "immediate injunction and transfer of the monies to the attorney of G/Club."  (June 11, 2024, Crim. Trial Tr. at 2075:18–20 (Mr. Khaled testifying), **Tr. Ex. 4**.)  Pursuant to the arbitration award, in September and October of 2021, Crane transferred a total of $46,549,359.00 to an account of Lawall & Mitchell.  (Lawall & Mitchell Sept. 2021 Valley National Bank Account Statement, **Tr. Ex. 44**; Lawall & Mitchell Oct. 2021 Valley National Bank Account Statement, **Tr. Ex. 45**; *see* Stipulation Regarding Bank Records, **Tr. Ex. 46**; May 31, 2024, Crim. Trial Tr. at 940:1–5, **Tr. Ex. 47**; Aug. 24, 2022, Letter, **Tr. Ex. 50**.)

### *Purchase of the Mahwah Mansion is funded by G Club Monies*[7]

48.    On November 28, 2021, Lawall & Mitchell transferred $46,549,275.00 of the funds to Hamilton Opportunity Fund, of which Mr. Je is the nominal owner.  (Dec. 2, 2021, Query Results Report at SEC-VALLEYNB-E-0000186, **Tr. Ex. 49**; Aug. 24, 2022, Letter, **Tr. Ex. 50**; Register of Members, **Tr. Ex. 53**, at 61–62; *see* Stipulation Regarding Bank Records, **Tr. Ex. 46**; May 31, 2024, Crim. Trial Tr. at 940:1–5, **Tr. Ex. 47**; Declaration Concerning Bank

---

[7]  The Court concludes the subscription agreement attached to the He Declaration does not create a genuine dispute of material fact as to the source of the funds used to purchase the Mahwah Mansion.  (Subscription Agreement, He Decl. Ex. A.)

Records, **Tr. Ex. 54**.)  During the trial in the Criminal Action, Ms. Reyes, the then-CEO of G

Club, testified she did not ask Attorney Mitchell to make this transfer and she was not sure who

did.  (June 18, 2024, Crim. Trial Tr. at 3112:1–6 (Ms. Reyes testifying), **Tr. Ex. 52**.)  Ms. Reyes

testified she did not recall being consulted about, and "did not have a view one way or the other",

"whether transferring the $46 ½ million . . . was a good idea for G|CLUBS".  (*Id.* at 3112:7–13.)

49.    Hamilton Opportunity Fund (i) on December 8, 2021, transferred $2,000,000.00

to CME's counsel, McDonnell & Whitaker, as a deposit of the $26,000,000.00 purchase price for

the Mahwah Mansion; and (ii) on December 16, 2021, the same date Taurus Fund was formed,

transferred $24,500,000.00 to a trust account of Insight Title Services LLC ("Insight Title

Services").  (Hamilton Opportunity Fund Dec. 2021 Silvergate Bank Statement, **Tr. Ex. 55**, at

17[8].)  Insight Title services acted as the settlement agent in connection with the sale of the

Mahwah Mansion, "so they handled the funds for the transaction. . . . They received the deposit,

the buyer's funds . . . and then they disburse the funds in accordance with the closing statement."

(June 24, 2024, Crim. Trial Tr. at 3887:4–18 (Attorney Buck testifying), **Tr. Ex. 15**.)

50.    On December 17, 2021, Insight Title Services transferred $24,344,844.44, with

$10,852,425.02 transferred to CME to complete payment of the purchase price, $13,157,693.42

transferred to parties with liens on the Mahwah Mansion or paying costs of sale borne by CME,

$334,726.00 paying various settlement charges, $10,103.40 paying a tax adjustment, and $15.04

paying a sewer adjustment.  (Settlement Statement (HUD-1), **Tr. Ex. 56**; IT-8121 Summary at

SEC-ITS-E-0000009, **Tr. Ex. 57**; *see* June 13, 2024, Crim. Trial Tr. at 2515:17–22, **Tr. Ex. 48**;

*see also* Stipulation Regarding Documents, **Tr. Ex. 58**; June 3, 2024, Crim. Trial Tr. at 992:21–

---

[8]  Trustee Exhibit 55 appears starting at page 6 of docket item 171.  (ECF No. 171.)  Because
Trustee Exhibit 55 was not filed as a separate document, page citations for Trustee Exhibit 55
refer to the pages of docket item 171 inclusive of the first 5 pages.

25, **Tr. Ex. 59**.) Insight Title Services transferred the remaining $155,155.56 to Attorney Buck's attorney trust account. (Domestic Wire Transfer at SEC-ITS-E-0000029, **Tr. Ex. 57**.)

51. Ms. Reyes testified she did not know what the Mahwah Mansion was, G Club did not have any homes for its members to stay in, and she was not aware G Club had purchased any mansion. (June 17, 2024, Crim. Trial Tr. at 3014:21–24, 3015:2–16 (Ms. Reyes testifying), **Tr. Ex. 1**.)

52. Following the purchase of the Mahwah Mansion, on December 21, 2021, Attorney Buck entered into an agreement of continued representation of Taurus Fund with Attorney Mitchell acting as "authorized person" for Taurus Fund. (Dec. 21, 2021–Feb. 21, 2022, Email Chain at Buck_Esq_SDNY_0005694, **Tr. Ex. 60**; *see* June 24, 2024, Crim. Trial Tr. at 3894:15–95:22, 3896:11–12 (Attorney Buck testifying), **Tr. Ex. 15**.) Pursuant to the agreement, Attorney Buck was paid a fixed monthly fee in exchange for (i) using her trust account to receive funds from or on behalf of Taurus Fund to pay vendors; and (ii) negotiating non-disclosure agreements with vendors. (June 24, 2024, Crim. Trial Tr. at 3893:4–15 (Attorney Buck testifying), **Tr. Ex. 15**.) Attorney Buck performed these services until February 2023 and made frequent payments, for "[c]onstruction and renovation, furnishings, artwork, [and] furniture" at the Mahwah Mansion. (*Id.* at 3893:16–94:3.)

53. Between December 21, 2021, and July 21, 2022, Hamilton Opportunity Fund transferred $18,000,000.00 to Attorney Buck's trust account, including $5,000,000.00 traceable to a transfer Hamilton Opportunity Fund received from ACA Capital Group Limited. (Hamilton Opportunity Fund Dec. 2021–Mar. 2022 Silvergate Bank Statements, **Tr. Ex. 55**, at 17–27; Hamilton Opportunity Fund July 2022 Silvergate Bank Statement, **Tr. Ex. 61**, at 34.) These funds were largely used for the payment of expenses related to the Mahwah Mansion. (June 24,

2024, Crim. Trial Tr. at 3894:1–9 (Attorney Buck testifying), **Tr. Ex. 15**.)  Attorney Mitchell, as

Taurus Fund's representative, was Attorney Buck's initial contact.  (*Id.* at 3893:2–3.)  She later

received authorization for paying invoices from Mr. Barnett, Ms. Chow, and Mr. Sean Jing.  (*Id.*

at 3895:2–18, 3898:10–12, 3899:10–13; *see also* Dec. 21, 2021–Feb. 21, 2022, Email Chain, **Tr.

Ex. 60**.)

54.     During the trial in the Criminal Action, Mr. Barnett testified Mr. Jing acted as a

personal assistant for the Individual Debtor's family and served as property manager for the

Mahwah Mansion.  (July 8, 2024, Crim. Trial Tr. at 5523:3–23 (Mr. Barnett testifying), **Tr. Ex.

22**.)  Mr. Barnett understood Mr. Jing to be among those he "classified" in "a joking manner" as

the Individual Debtor's family's "indenture[d] servants", because he believed Mr. Jing and

others "did whatever personal stuff the family needed".  (*Id.* at 5523:21–25:7.)  Mr. Barnett

believed Mr. Jing worked for HCHK Technologies with Ms. Chow.  (*Id.* at 5522:14–20.)  Some

invoices related to furnishings for, and renovation and other work at, the Mahwah Mansion and

the Taconic Property were addressed to Mr. Jing.  (*See, e.g.*, Feb. 2, 2022, Invoice, **Tr. Ex. 63**;

Jan. 24, 2022, Invoice at Buck_Esq_SDNY_0000550, **Tr. Ex. 64**.)

### <u>Use of the Mahwah Mansion</u>
### *Personal Property and Bedrooms at the Mahwah Mansion*

55.     During a March 15, 2023, search of the Mahwah Mansion, the FBI recovered

personal possessions of the Individual Debtor and his immediate family members, including,

among other things:

(a)     The Individual Debtor's prescription medication (Photograph, List of
Exhibits Ex. 17, ECF No. 23 (admitted into evidence during hearing on preliminary
injunction); *see* Aug. 14, 2023, Hr'g Tr. at 93:20–22, ECF No. 46);

(b)     The Individual Debtor's Stefano Ricci Club card and welcome booklet
(Photographs, **Tr. Exs. 101–02**; *see* June 20, 2024, Crim. Trial Tr. at 3552:18–54:3 (Ms.
Gabriella Luciano testifying), **Tr. Ex. 71**);

(c)    A collection of suits including with the label "Brioni for Miles Kwok" (Photographs, **Tr. Exs. 103–05**; *see* June 20, 2024, Crim. Trial Tr. at 3555:13–56:2 (Ms. Gabriella Luciano testifying), **Tr. Ex. 71**; *see also* Invoice, **Tr. Ex. 134**; Stipulation Regarding Greenwich Connecticut Search, **Tr. Ex. 135**; May 24, 2024, Crim. Trial Tr. at 60:21–62:20, **Tr. Ex. 99**);

(d)    The Individual Debtor's New York learner's permit (Photograph, **Tr. Ex. 106**; *see* June 20, 2024, Crim. Trial Tr. at 3563:1–5 (Ms. Luciano testifying), **Tr. Ex. 71**);

(e)    The Individual Debtor's Hong Kong ID card (Photograph, **Tr. Ex. 107**; *see* June 20, 2024, Crim. Trial Tr. at 3563:15–22 (Ms. Luciano testifying), **Tr. Ex. 71**);

(f)    The Individual Debtor's Hong Kong passport (Photographs, **Tr. Ex. 108**; *see* June 20, 2024, Crim. Trial Tr. at 3564:18–23 (Ms. Luciano testifying), **Tr. Ex. 71**);

(g)    The social security card, health insurance card, and credit card of the Individual Debtor's wife (Photographs, **Tr. Exs. 109–11**; *see* June 20, 2024, Crim. Trial Tr. at 3564:6–17, 3564:24–65:9 (Ms. Luciano testifying), **Tr. Ex. 71**);

(h)    Personal photographs of the Individual Debtor (Photographs, **Tr. Exs. 113–14**; *see* June 20, 2024, Crim. Trial Tr. at 3566:5–7 (Ms. Luciano testifying), **Tr. Ex. 71**);

(i)    Numerous pieces of LEGO toy sets (Photographs, **Tr. Exs. 125–27**), which the Individual Debtor's wife enjoys and were present at the Taconic Property and the apartment at the Sherry-Netherland Hotel (July 9, 2024, Crim. Trial Tr. at 5600:11–01:8 (Mr. Barnett testifying), **Tr. Ex. 124**);

(j)    Clothing, handbags, shoes, and personal items (Photographs, **Tr. Exs. 115–16**; *see* June 20, 2024, Crim. Trial Tr. at 3555:10–15 (Ms. Luciano testifying), **Tr. Ex. 71**); and

(k)    The completion certificate awarded to the Individual Debtor's son in January 2015 for "successfully attend[ing] the Ferrari challenge" (Photograph, **Tr. Ex. 117**; *see* June 20, 2024, Crim. Trial Tr. at 3545:16–24 (Ms. Luciano testifying), **Tr. Ex. 71**).

56.    During the search on March 15, 2023, the FBI also found, among other things:

(a)    Documents describing various rooms and features of the Mahwah mansion as belonging to "Boss", "madame", "Mei", "Wayne", and "son" (Lists, **Tr. Exs. 118–19**; June 21, 2024, Crim. Trial Tr. at 3598:1–99:10, **Tr. Ex. 72**);

(b)    An invoice dated February 11, 2022, from Cedric Dupont Antiques referring to items to be placed in "madame's bed south door right" and "Mei's bedroom,

bed left top to ceiling" (Photographs, **Tr. Exs. 120–22**; June 21, 2024, Crim. Trial Tr. at 3592:4–94:4, **Tr. Ex. 72**); and

(c)     A copy of a purported residential lease agreement under which Taurus Fund SP, as landlord, agreed to rent the Mahwah Mansion, described as a "single-family home" to Ms. Hing Chi Ngok, the Individual Debtor's wife, as tenant, for a lease term of June 1, 2022, through May 31, 2024, with rent of $100,000.00 per month, which lease is signed by Ms. Ngok but not Taurus Fund SP (Residential Lease Agreement, **Tr. Ex. 123**; June 21, 2024, Crim. Trial Tr. at 3607:9–10:4, **Tr. Ex. 72**).

57.     When questioned about the Mahwah Mansion in September 2023 during her deposition taken in the adversary proceeding *Despins v. Greenwich Land, LLC (In re Kwok)*, Case No. 22-50073 (JAM), Adv. P. No. 23-05005 (JAM) (Bankr. D. Conn. July 2, 2024), Ms. Ngok never mentioned the existence of such a lease.  Instead, Ms. Ngok claimed the Mahwah Mansion was the base of the New Federal State of China ("NFSC").  (Sept. 11, 2023, Depo. Tr. at 75:2–4, 80:6–11, **Tr. Ex. 12**.)

58.     The Wi-Fi password for the Mahwah Mansion was "Homesweethome". (Printouts, **Tr. Exs. 133–34**; July 2, 2024, Crim. Trial Tr. at 4787:21–88:19 (Ms. Jessica Volchko testifying), **Tr. Ex. 73**.)

59.     Mr. Cao testified at his Rule 2004 examination each of the Individual Debtor, Ms. Guo, and Ms. Ngok had a bedroom in the Mahwah Mansion and Mr. Cao, the Individual Debtor, Ms. Guo, and Ms. Ngok had each stayed overnight at the Mahwah Mansion.  (Oct. 20, 2023, Depo. Tr. at 110:4–11:25 (Mr. Cao testifying), **Tr. Ex. 62**.)

60.     During the trial in the Criminal Action, Mr. Barnett testified he "took the [Individual Debtor] to [the Mahwah Mansion].  I don't think it was two or three times a week, maybe in the beginning when it first started.  Other than that it was sporadic.  And I wasn't with him everyday so I don't have an actual accounting of how many times he was there."  (July 8, 2024, Crim. Trial Tr. at 5516:21–17:3 (Mr. Barnett testifying), **Tr. Ex. 22**; *see also* Barnett Decl.

42

¶ 6 ("I travelled with the [Individual] Debtor when he visited the Mahwah [Mansion], which may have been four to five times a month.").)

61.    The Individual Debtor used the Mahwah Mansion to stream videos to his followers.  (Barnett Decl. ¶ 6.)

### Movement of Personal Property from Other Residences to the Mahwah Mansion

62.    On October 23, 2023, the Trustee filed an emergency motion (the "Furniture Motion") regarding preservation of property of the Individual Debtor's bankruptcy estate.  (ECF No. 70.)  As discussed in the Furniture Motion and its associated exhibits, numerous pieces of furniture, artwork, and antiques were removed from the Individual Debtor's residence at the Sherry-Netherland Hotel and moved to the Mahwah Mansion.  (Furniture Motion ¶ 9.a., ECF No. 70.)  Before they were moved to the Mahwah Mansion, much of the furniture and artwork as well as many of the antiques were first moved to the Taconic Property.  (*Id.* ¶ 9.b.)

63.    Evidence presented during the trial in the Criminal Action shows such movement of property.  For instance, an invoice from Flat Rate Movers shows Attorney Buck paid $118,000.00 to move items in January 2022 from "373 Taconic Rd, Greenwich, CT 06831" to "675 Ramapo Valley Rd Mahwah, NJ 07430".  (Invoice at Buck_Esq_SDNY_0002206, **Tr. Ex. 74**.)  The invoice, which lists two full pages of furniture to be moved from the Taconic Property to the Mahwah Mansion, was e-signed by Mr. Barnett using the email address of Ms. Chow at HCHK Technologies.  (*Id.* at Buck_Esq_SDNY_000212.)

64.    On October 31, 2023, Taurus Fund filed a report (the "Furniture Report") in response to the Furniture Motion.  (ECF No. 78.)  Of the approximately 211 items in the Mahwah Mansion, ownership of which the Trustee requested Taurus Fund identify, Taurus Fund represented only approximately 24 items were owned by Taurus Fund.  (*Id.*)

### *Management, Control, and Use of Taurus Fund*

65.     Taurus Fund's nominal sole member is Taurus Management (June 24, 2024, Crim. Trial Tr. at 3888:19–89:3 (Attorney Buck testifying), **Tr. Ex. 15**), which is nominally owned by Hamilton Opportunity Fund (Rule 26 Disclosures ¶ 1) e), **Tr. Ex. 20**), which is itself nominally owned by Mr. Je (Register of Members, **Tr. Ex. 53**, at 61–62).   During the trial in the Criminal Action, Ms. Karin Maistrello, a former assistant of the Individual Debtor, testified Mr. Je was a friend of the Individual Debtor and his "finance person" who "would handle the investments and financing for" the Individual Debtor.   (May 29, 2024, Crim. Trial Tr. at 458:18–22 (Ms. Maistrello testifying), **Tr. Ex. 98**.)   In the defense's opening statement during the trial in the Criminal Action, the Individual Debtor, through his counsel, stated "William Je was the finance guy.   He's a well-regarded investment banker who had managed the fortune not just of the Guo family fund but he had managed the fortunes of many other companies."   (May 24, 2024, Crim. Trial Tr. at 42:16–19 (Attorney Sabrina P. Shroff speaking), **Tr. Ex. 99**.)   In voice recordings introduced into evidence during the trial in the Criminal Action, Mr. Je, when referencing the Individual Debtor, called him the "principal".   (Transcription of May 6, 2021, Audio File (including translation from Mandarin Chinese to English) at 8, **Tr. Ex. 67**; Transcription of May 4, 2021, Audio File (including translation from Mandarin Chinese to English) at 9–10, **Tr. Ex. 68**; *see also* Transcription of May 4, 2021, Audio File at 2, **Tr. Ex. 100**; May 4, 2021, Audio File, **Tr. Ex. 128**.)

66.     Since 2020, Mr. Barnett, a manager of Taurus Fund, has been employed as the Individual Debtor's security guard through a succession of entities, namely, Golden Spring, Lamp Capital, HCHK Technologies, and HCHK Property Management, Inc. ("HCHK Property"), eventually becoming head of security for the Individual Debtor.   (July 8, 2024, Crim.

Trial Tr. at 5416:1–6, 5480:5–9, 5480:24–81:2, 5481:12–24 (Mr. Barnett testifying), **Tr. Ex. 22**; *see also* Barnett Decl. ¶¶ 1, 4.) Mr. Barnett has no personal knowledge about the Individual Debtor's ownership of, or sourcing of the funds for, Taurus Fund or the entities through which he was employed. (July 8, 2024, Crim. Trial Tr. at 5480:19–23, 5481:3–11 (Mr. Barnett testifying), **Tr. Ex. 22**; Barnett Decl. ¶ 5.)

67.     Mr. Barnett referred to Ms. Wang as his "immediate boss" and referred to the Individual Debtor as "principal" and "boss". (July 8, 2024, Crim. Trial Tr. at 5481:15–18, 5484:11–14 (Mr. Barnett testifying), **Tr. Ex. 22**.) Mr. Barnett purchased motorcycles for the Individual Debtor at the Individual Debtor's request and believes he at one point held title to five motorcycles he did not own. (*Id.* at 5525:8–26:1.) There were five motorcycles found at the Mahwah Mansion, some of which the Individual Debtor was seen driving. (Furniture Motion at 58–63.) Four of these motorcycles were transferred from Mr. Barnett to Mr. Cao (*compare* New York Abstract of Title Record, **Trustee Reply Ex. B** *with* New Jersey Registration Information Inquiry, Complaint Ex. 4, Case No. 22-50073 (JAM), Adv. P. No. 24-05001 (JAM) (Bankr. D. Conn. Feb. 6, 2024), ECF No. 1 (the "Cao Complaint"); *compare* New York Abstract of Title Record, **Trustee Reply Ex. C** *with* New Jersey Registration Information Inquiry, Cao Complaint Ex. 2; *compare* New York Abstract of Title Record, **Trustee Reply Ex. D** *with* New Jersey Registration Information Inquiry, Cao Complaint Ex. 3; *compare* New York Abstract of Title Record, **Trustee Reply Ex. E** *with* New Jersey Registration Information Inquiry, Cao Complaint Ex. 5), who never used the motorcycles (Oct. 20, 2023, Depo. Tr. at 59:3–5, 66:16–22, 172:16–24 (Mr. Cao testifying), **Tr. Ex. 62**) and understood he received title for the benefit of the Individual Debtor's family from men who worked in the Individual Debtor's family office (*id.* at

60:8–61:24, 63:20–65:3).  Mr. Barnett agreed to transfer the fifth motorcycle to the Individual

Debtor's bankruptcy estate.  (Consent Order, Main Case ECF No. 3220.)

68.    Despite signing Taurus Fund's articles of organization, Mr. Barnett testified

during the trial in the Criminal Action as follows:

> Q.    Mr. Barnett, do you know which entity bought the property that has been referred to as Mahwah?
>
> A.    Yes, Taurus Fund purchased the property.
>
> Q.    Did you have a role at the Taurus Fund?
>
> A.    I did not have a role at the Taurus Fund.
>
> Q.    Did you have a signatory role at the Taurus Fund?
>
> A.    Yes, I did.  I was unaware of that; but yes, I did.
>
> Q.    And what was the signatory role that you had?
>
> A.    Well, apparently, which I didn't find out until much later, that I was the manager, one of the managers of that, of the fund.

(July 8, 2024, Crim. Trial Tr. at 5452:17–53:2 (Mr. Barnett testifying), **Tr. Ex. 22**.)

69.    As to his role at Taurus Fund, Mr. Barnett further testified during the trial in the

Criminal Action that: "[O]n paper they had me down as a manager.  That wasn't my idea of what

my job role was.  So when they ask me to be a manager, I just thought they just meant to manage

the property and install the security services.  It wasn't to manage Taurus Fund because I would

have no experience, nor would I undertake something like that."  (July 8, 2024, Crim. Trial Tr. at

5514:4–12 (Mr. Barnett testifying), **Tr. Ex. 22**.)  The paperwork Mr. Barnett signed related to

Taurus Fund was given to him by Attorney Mitchell, whom Mr. Barnett understood to be a

lawyer for the Individual Debtor's family and was personally close with the Individual Debtor's

family.  (*Id.* at 5514:15–20.)

70.     In addition to managing security services at the Mahwah Mansion, Mr. Barnett also coordinated with Attorney Buck regarding payment of renovation and construction expenses for the Mahwah Mansion.  (July 8, 2024, Crim. Trial Tr. at 5522:1–10 (Mr. Barnett testifying), **Tr. Ex. 22**.)

71.     Taurus Fund paid invoices unrelated to the Mahwah Mansion.  (*See, e.g.*, Spreadsheet, **Tr. Ex. 85**; *see also* June 24, 2024, Crim. Trial Tr. at 3884:11–85:15 (Attorney Buck testifying), **Tr. Ex. 15**.)  For example:

(a)     On January 27, 2022, Attorney Buck paid $140,938.69 for an invoice from Faust Harrison Pianos for a Bosendorfer 185VC Porsche piano with a custom bench. (Bill of Sale, **Tr. Ex. 75**; Spreadsheet at row 40, **Tr. Ex. 85**.)  The piano was sold to Taurus Fund but the shipping address was "Gladys Chow[,] 3 Columbus Circle, 20th Floor[,] New York, NY 10019".  (Bill of Sale, **Tr. Ex. 75**.)

(b)     On March 31, 2022, Attorney Buck paid $6,568.35 for an invoice from Roadway Movers Inc. for a move from the Mahwah Mansion to 3 Columbus Circle. (Mar. 29, 2022, Email Chain at Buck_Esq_SDNY_0001064, **Tr. Ex. 76**; Spreadsheet at row 113, **Tr. Ex. 85**.)  The invoice was addressed to Golden Spring.  (Mar. 29, 2022, Email Chain at Buck_Esq_SDNY_0001064, **Tr. Ex. 76**.)

(c)     On April 29, 2022, Attorney Buck paid $400.00 for a January 24, 2022, invoice from Merritt Plumbing for a job at the Taconic Property.  (Spreadsheet at row 142, **Tr. Ex. 85**; Jan. 24, 2022, Invoice, **Tr. Ex. 86**.)

(d)     On January 11, April 5, and May 1, 2022, Taurus Fund, using 162 East 64th Street, New York, New York, as its address, rented four storage units at Westy Self Storage in Upper Saddle River, New Jersey.  (Occupancy Agreements, **Tr. Ex. 87**.)  Mr. Barnett signed the occupancy agreement on behalf of Taurus Fund as its general manager and made a credit authorization for payment of monthly rent.  (*Id.*)  Mr. Barnett initially paid rent for the storage units via a Bento credit card linked to a Golden Spring account (Golden Spring Jan.–June 2022 Bento Bank Statement at HWK-Bento: 000360–63, 000383, 000402, 000419, 000420, 000422, 000434, 000436, 000438, 000447, 000449, 000451, **Tr. Ex. 88**) and later did so via an American Express credit card linked to HCHK Property (*see, e.g.*, HCHK Property July 18, 2022, American Express Statement at pp. 8/20, 10/20, **Tr. Ex. 89**; HCHK Property Aug. 18, 2022, American Express Statement at pp. 10–12/22, **Tr. Ex. 90**; HCHK Property Sept. 16, 2022, American Express Statement at p. 12/23, **Tr. Ex. 91**; HCHK Property Oct. 18, 2022, American Express Statement at pp. 12/28, 14/28, **Tr. Ex. 92**; HCHK Property Nov. 17, 2022, American Express Statement at pp. 15–16/34, **Tr. Ex. 93**; HCHK Property Dec. 18, 2022, American Express Statement at p. 16/33, **Tr. Ex. 94**; HCHK Property Jan. 18,

2023, American Express Statement at p. 14/31, **Tr. Ex. 95**; HCHK Property Feb. 15, 2023, American Express Statement at pp. 13–14/31, **Tr. Ex. 96**; HCHK Property Mar. 17, 2023, American Express Statement at pp. 12–13/31, **Tr. Ex. 97**).  The Trustee's counsel visited the four storage units and confirmed, among other things, that "of the approximately 640 boxes we inspected and inventoried, approximately 475 of them either (i) bear a Golden Spring label or (ii) otherwise bear handwritten annotations or contents relating directly to the [Individual] Debtor."  (Decl. of Luyi Song ¶ 8, *Despins v. Golden Spring (New York) Ltd. (In re Kwok)*, Case No. 22-50073 (JAM), Adv. P. No. 23-05018 (JAM) (Bankr. D. Conn. Feb. 23, 2024), ECF No. 40.)  Taurus Fund subsequently acknowledged two of these storage units "were utilized by an entity or entities other than Taurus Fund" beginning in April 2022.  (Limited Objection ¶ 5, *Despins v. Golden Spring (New York) Ltd. (In re Kwok)*, Case No. 22-50073 (JAM), Adv. P. No. 23-05018 (JAM) (Bankr. D. Conn. Mar. 19, 2024), ECF No. 43.)

72.      On July 16, 2024, the Individual Debtor was convicted on nine of twelve counts against him in the Criminal Action.  (Criminal Action, ECF No. 395.)  Subsequently, on July 28, 2024, Taurus Fund stopped making payments related to the Mahwah Mansion, this obliging the Trustee to step forward to carry those burdens.  (*See, generally*, Emergency Request for Status Conference, ECF No. 106.)  Taurus Fund's cessation of payment was due to the Individual Debtor's conviction and related likely forfeiture of the Mahwah Mansion.  (*See id.* Ex. B.)  In response to the Trustee's concerns, Taurus Fund stated "there is no individual affiliated with [Taurus Fund] who has the authority to decide 'whether' Taurus Fund will continue to comply with existing orders . . . and pay all expenses".  (Fourth Amended Response at 3, ECF No. 109.)

## VI.    DISCUSSION

Based upon the undisputed facts, the Trustee argues he is entitled to a judgment as a matter of law on all three claims in the complaint, which seek (i) declaratory judgment that, respectively, the Individual Debtor (a) beneficially owns the Mahwah Mansion; (b) beneficially owns Taurus Fund; and (c) is the *alter ego* of Taurus Fund and (ii) orders requiring the turnover of, respectively, (a) the Mahwah Mansion; (b) any ownership interests in Taurus Fund; and (c) all assets of Taurus Fund.  In addition to their evidentiary objections, discussed above, the

Taurus Parties argue the Trustee lacks standing to assert his claims and, assuming the facts support the Trustee's contentions, the Individual Debtor has no beneficial interest in the Mahwah Mansion because, insofar as he used, and exercised control over, the Mahwah Mansion as his own property rather than the property of his purported anti-Chinese Communist Party ("CCP") movement, the NFSC, he stole from G Club members that invested in the NFSC. The Taurus Parties also assert the Trustee has put forward no factual material that supports the relief he seeks.

A.    **Standing**

Turning first to standing, the Trustee argues he has standing to bring claims on behalf of the creditors of the Individual Debtor because the claims are general claims of the Individual Debtor's creditors and, if instead he brings his claims on behalf of the Individual Debtor, he is not *in pari delicto* because the insider exception applies. The Taurus Parties argue the Trustee's claims are not general claims of creditors but rather the particular claims of victims of the Individual Debtor's security and wire fraud involving G Club. Therefore, the Taurus Parties argue, pursuant to the doctrine propounded by *Shearson Lehman Hutton Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991), the Trustee lacks standing to bring his claims because he is *in pari delicto* with the Taurus Parties in the commission of said security and wire fraud.

The *Wagoner* doctrine provides while a bankruptcy trustee has standing under the Bankruptcy Code to bring certain claims on behalf of creditors, *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 700 (2d Cir. 1989), absent such statutory authority "a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself", *Wagoner*, 944 F.2d 114, 118; *see Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1093 (2d Cir. 1995); *Sobchack v. Am. Nat'l*

49

*Bank & Trust Co. (In re Ionosphere Clubs, Inc.)*, 17 F.3d 600, 607 (2d Cir. 1994), and courts must determine (i) whether the debtor could have brought the claim and (ii) if so, whether the trustee is *in pari delicto* by imputation of the debtor's conduct, *Wagoner*, 944 F.2d at 119–20.[9]

A bankruptcy trustee has statutory authority to bring general claims of creditors on behalf of creditors at large but not particular claims of particular creditors. *Stadtmauer v. Tulis (In re Nordlicht)*, 115 F.4th 90, 105 (2d Cir. 2024). Whether a bankruptcy trustee's standing to bring general claims on behalf of creditors at large stems from section 541(a), *In re Emoral, Inc.*, 740 F.3d 875, 879 (3d Cir. 2014); section 544(a), *Koch Refining v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1351–54 (7th Cir. 1987); or both, *PepsiCo*, 884 F.2d at 697–98, 701, a bankruptcy trustee has standing to bring general claims as the representative of the debtor's creditors in a mass collection action. *Nordlicht*, 115 F.4th at 105. Where a bankruptcy trustee brings general claims on behalf of creditors, the *Wagoner* doctrine is not implicated. 944 F.2d at 118 ("The trustee insists he is not asserting the claims of the noteholders, so it is unnecessary for us to delve deeply into when, if ever, a trustee may sue a third party on behalf of the bankrupt's creditors.").

Therefore, the first issue is whether the Trustee brings general claims of the Individual Debtor's creditors or claims of the Individual Debtor. Contrary to the Taurus Parties' assertions, the Trustee does not allege, or seek relief for, securities or wire fraud; instead he alleges beneficial ownership and *alter ego* and, on these bases, seeks turnover of property of the estate. With respect to the Trustee's first and second claims, beneficial ownership is recognized by New

---

[9] Although an assertion of *in pari delicto* is typically considered an affirmative equitable defense, the *Wagoner* doctrine, including its consideration of *in pari delicto*, "functions as a prudential standing limitation." *Carney ex rel. Highview Point Partners, LLC v. Horion Invs. Ltd.*, 107 F. Supp. 3d 216, 228 (D. Conn. 2015).

Jersey[10] and Nevada[11] law.  *See, e.g.*, NEV. REV. STAT. § 92A.440; *In re NJ Affordable Homes Corp.*, Case No. 05-60442 (DHS), 2006 WL 2128624, at *8 (Bankr. D.N.J. 2006).  Creditors may assert beneficial ownership to collect debts.  *See, e.g.*, *LiButti v. United States*, 968 F. Supp. 71, 75 (N.D.N.Y. 1997) (applying federal common law in absence of articulated state law standard), *aff'd in part, rev'd in part on other grounds*, 178 F.3d 114 (2d Cir. 1999); *Paloian ex rel. Dordevic v. Dordevic (In re Dordevic)*, 633 B.R. 553, 558 (Bankr. N.D. Ill. 2021) (same), *aff'd by* 67 F.4th 372 (7th Cir. 2023).  Similarly, with respect to the Trustee's third claim, under Nevada law[12] creditors can bring reverse veil-piercing claims to, among other things, attempt to collect on a judgment.  *LFC Mktg. Grp., Inc. v. Loomis*, 8 P.3d 841, 846 (Nev. 2000).

---

[10]  The Trustee's first claim alleges the Individual Debtor beneficially owns the Mahwah Mansion.  Generally, bankruptcy courts apply forum state choice-of-law rules to issues of state law.  *Geron ex rel. Thelen LLP v. Seyfarth Shaw LLP (In re Thelen LLP)*, 736 F.3d 213, 219 (2d Cir. 2013).  Connecticut courts apply the Restatement (Second) of Conflict of Laws to tort and contract law.  *Western Dermatology Consultants, P.C. v. VitalWorks, Inc.*, 153 A.3d 574, 584 (Conn. 2016); *Macomber v. Travelers Property & Casualty Corp.*, 894 A.2d 240, 256–57 (Conn. 2006).  The Court concludes that Connecticut courts would apply the Restatement (Second) of Conflict of Laws to property law as well.  "The forum will attempt to determine questions as to the existence and extent of equitable interests in land in the same way that these questions would have been decided in the very case at hand by the courts of the situs," which is usually applicable local law.  RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 235 (2023).  The Mahwah Mansion is located in New Jersey.  Hence, New Jersey law applies to the Trustee's first claim.

[11]  The Trustee's second claim alleges the Individual Debtor beneficially owns Taurus Fund.  Under Connecticut law, "[t]he law of the governing jurisdiction of a foreign limited liability company governs: (1) The internal affairs of the company; (2) the liability of a member as member and a manager as manager for a debt, obligation or other liability of the company; and (3) the liability of a series of the company."  CONN. GEN. STAT. § 34-275(a); *see Thelen LLP*, 736 F.3d at 219.  Based on the substantially similar statute in existence at the time, the Connecticut Supreme Court has ruled that the state of formation of a foreign limited liability company governs the issue of veil-piercing.  *Weber v. U.S. Sterling Securities, Inc.*, 924 A.2d 816, 822–23 (Conn. 2007).  The Court concludes that this reasoning would extend to beneficial ownership as well.  Taurus Fund is incorporated in Nevada.  Hence, Nevada law applies to the Trustee's second claim.

[12]  Because the Trustee's third claim seeks to pierce the corporate veil of a Nevada limited liability company, the Court concludes Connecticut courts would apply Nevada law.  *See* n. 11, *supra*.

The Trustee's claims are general: like the reverse veil-piercing claim in *Nordlicht*, the Trustee's claims are the sort *any* hypothetical judgment creditor could bring, 115 F.4th at 107–09, not just claims that are very commonly held on the specific facts of the Individual Debtor's case, *cf. Picard v. JPMorgan Chase Bank & Co. (In re Bernard L. Madoff Inv. Secs. LLC)*, 721 F.3d 54, 58–59 (2d Cir. 2013) (seeking to recover from banks on theory the banks knew or should have known about the Madoff Ponzi scheme); *see also Wagoner*, 944 F.2d at 116–17 (seeking to recover from banks on theory the banks knew or should have known about the debtor's fraud).  Accordingly, the *Wagoner* doctrine is inapplicable, the Court does not reach the parties' arguments regarding *in pari delicto*, and the Court concludes the Trustee has standing to assert his claims.  *See, e.g., Gordon v. Harman (In re Harman)*, 529 B.R. 352, 353 (Bankr. N.D. Ga. 2015) ("Trustee stands in the shoes of the creditors whose claims are unable to proceed because of the bankruptcy; it would be inequitable to prevent creditors from asserting their claims due to the existence of the bankruptcy estate while simultaneously imputing Debtor's alleged conduct on Trustee.  The doctrine of *in pari delicto* would not apply to Debtor's creditors; therefore, it should not apply to Trustee.").

The Taurus Parties' claim that the victims of the Individual Debtor's crimes have a higher priority in recovering from the Mahwah Mansion and Taurus Fund generally is not presently before the Court.  There may be particular claims that particular creditors could bring against the Taurus Parties, but the Trustee does not bring those claims.  Furthermore, it is the United States or its designee – not the Taurus Parties – which has standing to contest the priority of the bankruptcy estate's interest in the Mahwah Mansion and Taurus Fund relative to the criminal forfeiture interest in the same.  As discussed above, the United States and the Trustee have

partially settled this dispute[13], but it is subject to further resolution by agreement or in the appropriate forum on appropriate motion and process.  The Trustee's Motion for Summary Judgment against the Taurus Parties in this adversary proceeding is not the context to resolve this issue between the United States and the Trustee.

### B.    Beneficial Ownership of the Mahwah Mansion

Turning to the merits, the Court will first consider whether the Trustee is entitled to a judgment as a matter of law on his first claim.  The Trustee argues there is no genuine dispute of material fact that (i) the Individual Debtor was the real purchaser of the Mahwah Mansion; (ii) Taurus Fund was a shell entity created to effectuate the Individual Debtor's purchase and hold the Mahwah Mansion; (iii) the Individual Debtor directed and controlled the renovation and furnishing of the Mahwah Mansion; (iv) the Individual Debtor directed and controlled the financing of the purchase and renovation of the Mahwah Mansion; and (v) the Individual Debtor and his family used the Mahwah Mansion as a personal residence.  The Trustee asserts the Individual Debtor placed the Mahwah Mansion in the possession of Taurus Fund to avoid his creditors, including Pacific Alliance Opportunity Fund LP ("PAX"), which was actively seeking to collect its debt in New York Supreme Court at the time the Mahwah Mansion was purchased.  The Taurus Parties argue the Individual Debtor cannot own the Mahwah Mansion because a thief does not take title to property and the Trustee's argument is predicated on theft of funds from G Club and its members.

---

[13]  The settlement contemplates the Trustee seeking judgment in this adversary proceeding and selling the Mahwah Mansion.  (ECF No. 98.)

1.      **Legal Standard**

As noted by the Trustee, New Jersey courts find beneficial ownership where a party maintains *de facto* ownership of a property but places title to the property in the hands of another as part of an overall scheme to hinder, delay, or defraud its creditors.  *NJ Affordable Homes*, 2006 WL 2128624, at *8 (determining debtor beneficially owned, and bankruptcy trustee could sell, properties it put in the names of investors in its Ponzi scheme).  Courts consider among other things: "(1) whether inadequate or no consideration was paid by the nominee; (2) whether the property was placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property; (3) whether there is a close relationship between the nominee and the transferor; (4) whether they failed to record the conveyance; (5) whether the transferor retains possession; and (6) whether the transferor continues to enjoy the benefits of the transferred property."  *LiButti*, 968 F. Supp. at 76 (applying federal common law nominee factors given lack of stated factors in New Jersey law); *see Dordevic*, 67 F.4th at 381 (applying federal common law nominee factors).  Courts must perform a nominee analysis "on an asset-by-asset basis."  *U.S. Secs. & Exch. Comm'n v. Ahmed*, 72 F.4th 379, 409 (2d Cir. 2023).

2.      **Analysis**

Most of the undisputed facts address whether the Individual Debtor (i) controlled the purchase of the Mahwah Mansion; and (ii) used the Mahwah Mansion as his own.  The Court will consider these issues before turning to other factors relevant to determining whether the Trustee is entitled to a judgment as a matter of law that the Individual Debtor beneficially owns the Mahwah Mansion.

### i.    Individual Debtor Controlled the Purchase of the Mahwah Mansion

There is no genuine dispute of material fact that the Individual Debtor controlled the purchase of the Mahwah Mansion for use by his family as a single-family residence. (Undisputed Facts 4–30, 38–51, 65–69.)  First, it is undisputed the Individual Debtor stated his intent to purchase the Mahwah Mansion as a residence for his family.  The Individual Debtor stated the terms of the buyer's offer (*compare* Undisputed Facts 10–11 *with* Undisputed Fact 13) and directed the purchase vehicle to be Mr. Je's fund, which owns the purchaser of the Mahwah Mansion, Taurus Fund (*compare* Undisputed Facts 11(b) *with* Undisputed Facts 16–17, *see also* Undisputed Facts 4(d), 5(c), 65).  The Individual Debtor stated his intent to reside at the Mahwah Mansion and such intent is reflected in the Purchase Agreement and Affidavit of Consideration for Use by Buyer.  (Undisputed Facts 11(a), 18, 27.)

Second, it is undisputed the buyer's professionals represented the Individual Debtor. While Attorney Mitchell, the buyer's representative, first stated he was representing the Individual Debtor's daughter and her family trust (Undisputed Fact 6) and then stated he was representing Taurus Fund SP (Undisputed Facts 19–20), (a) the Individual Debtor instructed Attorney Mitchell to use Mr. Je's fund, which includes Taurus Fund SP, to purchase the Mahwah Mansion (Undisputed Facts 11(b), 65); (b) Attorney Mitchell is personal counsel to the Individual Debtor working out of the Individual Debtor's offices and representing him, his family members, and his entities (Undisputed Fact 4(c)); and (c) Attorney Mitchell is personally close to the Individual Debtor (Undisputed Fact 69) and his wife told Attorney Buck, buyer's counsel, Lawall & Mitchell was representing clients who were like family to Attorney Mitchell and his wife (Undisputed Fact 19).  Moreover, it is undisputed Attorney Mitchell, among other things,

(i) relayed the Individual Debtor's offer to the purchase the Mahwah Mansion (*compare* Undisputed Facts 10–11 *with* Undisputed Fact 13);

(ii) followed up on the Individual Debtor's concern about the Mahwah Mansion being potentially haunted or otherwise unlucky or inauspicious (*compare* Undisputed Facts 8, 11(d) *with* Undisputed Fact 9);

(iii) relayed CME's reduction of the purchase price to the Individual Debtor (*compare* Undisputed Fact 9 *with* Undisputed Fact 10);

(iv) relayed the Mahwah Mansion floorplans to the Individual Debtor (Undisputed Facts 14–15, 32); and

(v) arranged multiple showings of the Mahwah Mansion, which the Individual Debtor attended (Undisputed Facts 6–8, 12).

The Court concludes from these undisputed facts Attorney Mitchell represented the Individual Debtor in connection with the purchase of the Mahwah Mansion.

In turn, Attorney Mitchell hired Ms. Frosini and Attorney Buck. (Undisputed Facts 6, 19–20.) Ms. Frosini, the buyer's broker, understood the Individual Debtor's family purchased the Mahwah Mansion as a personal residence. (Undisputed Facts 28–29.) Attorney Buck received direction from Attorney Mitchell and certain other individuals among the Individual Debtor's staff, namely, Ms. Chow, Mr. Jing, and Mr. Barnett, a defendant in this adversary proceeding. (Undisputed Facts 4(h)–4(j), 52–54, 66–69.)

Third, it is undisputed the Individual Debtor was present at all showings of the Mahwah Mansion and made personal comments about its features and design. (Undisputed Facts 8, 12.) During the first showing, the Individual Debtor inquired about whether the Mahwah Mansion was haunted, which was, as discussed above, a concern repeated by Attorney Mitchell as the buyer's representative. (Undisputed Facts 8–9.) During the second showing, the Individual Debtor and his wife went through the Mahwah Mansion in detail, including with respect to his wife's concern about the noisiness of the air conditioning. (Undisputed Fact 12.) After and

56

between the showings, the Individual Debtor made extensive comments and directions about the renovation and furnishing of the Mahwah Mansion leading up to and after the purchase. (Undisputed Facts 10–11, 32.)

Fourth, it is undisputed the Individual Debtor directed and controlled the funds used to purchase the Mahwah Mansion. The Mahwah Mansion was purchased by Taurus Fund, an indirect subsidiary of Hamilton Opportunity Fund, which is nominally owned by Mr. Je, using monies traceable to transfers from G Club. (Undisputed Facts 38, 65.) Despite lacking a formal role at G Club, the Individual Debtor was involved in its creation and day-to-day management. (Undisputed Facts 42–43.) The Individual Debtor controlled Crane, G Club's escrow agent, which received member payments on behalf of G Club. (Undisputed Facts 39–41.) The Individual Debtor vociferously demanded G Club's funds held by Crane be transferred to Hamilton, funding entities controlled by Mr. Je, who handled financial matters for the Individual Debtor. In addition, the Individual Debtor berated employees when such demands were not quickly carried out. (Undisputed Facts 4(d), 44–45, *see* Undisputed Fact 65.)

When Crane did not move the monies quickly enough, the Individual Debtor directed the commencement of arbitration proceedings, which resulted in the funds being transferred to G Club's counsel, Attorney Mitchell, pursuant to an arbitration award. (Undisputed Facts 46–47.) Without authorization from G Club's nominal management, Attorney Mitchell subsequently transferred the funds to a Hamilton entity, Hamilton Opportunity Fund SP. (Undisputed Fact 48.) The Individual Debtor directed Attorney Mitchell to use Hamilton to pay for the purchase of the Mahwah Mansion and again, without authorization from G Club's nominal management, Hamilton Opportunity Fund made the requisite payments. (Undisputed Facts 49–51; *compare* Undisputed Facts 11(b) *with* Undisputed Facts 16–17, *see also* Undisputed Facts 4(d), 5(c), 65.)

Taurus Fund was created at the time of the purchase to allow these steps in the purchase of the Mahwah Mansion to occur.  (Undisputed Facts 21, 25–27.)

Fifth, although the Taurus Parties' counsel seeks to diminish his prior testimony, it is undisputed Mr. Barnett, a defendant in this adversary proceeding, testified during the Criminal Action that the Individual Debtor purchased the Mahwah Mansion.  (Undisputed Fact 30.) Contrary to counsel's assertions, Mr. Barnett testified as to why he was surprised—it is not as counsel suggests because the question struck Mr. Barnett as strange, but rather because he does not believe the Mahwah Mansion fits the Individual Debtor's preferences.  (*Id.*)

### ii.      Individual Debtor Used the Mahwah Mansion as His Own

There is also no genuine dispute of material fact the Individual Debtor used the Mahwah Mansion as his own property.  (Undisputed Facts 31–37, 52–64, 72.)  The Mahwah Mansion is managed by Mr. Jing, the Individual Debtor's personal assistant, and security was provided by Mr. Barnett, the Individual Debtor's head of security.  (Undisputed Facts 4(i)4(j), 54, 66–70.) The Individual Debtor and his family had private quarters in the Mahwah Mansion.  (Undisputed Fact 59.)  Personal belongings of the Individual Debtor and his family, including identification materials, clothing, invoices, and personal effects, were found during the FBI's search at the Mahwah Mansion.  (Undisputed Fact 55–56.)  Items were moved from the Individual Debtor's residences at the Sherry-Netherland Hotel and Taconic Property to the Mahwah Mansion. (Undisputed Facts 62–64.)  The Individual Debtor spent time at the Mahwah Mansion. (Undisputed Facts 59–60.)  Among other things, he produced streaming content for his internet followers and fans at the Mahwah Mansion.  (Undisputed Fact 61.)  The internet password was "Homesweethome".  (Undisputed Fact 58.)

It is also undisputed the Individual Debtor controlled the furnishing and renovation of the Mahwah Mansion for his own and his family's benefit.  (Undisputed Facts 32–37.)  The boyfriend of the Individual Debtor's daughter, Mr. Cao, who referred to the Individual Debtor as "dad", oversaw construction at the Mahwah Mansion.  (Undisputed Facts 4(b), 31.)  Mr. Barnett as well as Ms. Chow and Mr. Jing, who are personal assistants to the Individual Debtor, oversaw the payment of invoices related to the renovation and furnishing of the Mahwah Mansion. (Undisputed Facts 4(h)–4(j), 33, 52–54.)

The Individual Debtor and Ms. Chow exchanged several WhatsApp messages discussing in detail what the Individual Debtor and his family wanted renovated and how they wished to furnish the Mahwah Mansion.  Ms. Chow assisted the Individual Debtor in his search and liaised with vendors.  (Undisputed Facts 32–37.)  One of the vendors selected to work on the renovations to the Mahwah Mansion, Promemoria, had previously worked with the Individual Debtor on other residences and understood its work at the Mahwah Mansion to be at the Individual Debtor's direction.  (Undisputed Facts 32, 34, 37.)  Others recognized the Individual Debtor as the person who had come into their store and taken pictures of items that were later purchased by assistants for the Mahwah Mansion.  (Undisputed Facts 32, 35–36.)  Many of the Individual Debtor's demands relayed to Ms. Chow related to specific family members and their rooms within the Mahwah Mansion.  (Undisputed Fact 32.)  Many of the invoices from vendors similarly reflect work done to benefit particular family members.  (Undisputed Fact 37.)

* * *

For these reasons, there is no genuine dispute of material fact (i) the Individual Debtor controlled the purchase of the Mahwah Mansion; and (ii) the Individual Debtor used the Mahwah Mansion as his own.  There is also no genuine dispute of material fact (iii) the Mahwah Mansion

was purchased shortly before the Individual Debtor filed for bankruptcy and while he was nominally insolvent and facing collection activity by, among others, PAX (*compare* Undisputed Fact 1 *with* Undisputed Fact 27); (iv) no consideration was exchanged for the funds used to purchase the Mahwah Mansion (*see, generally*, Undisputed Facts 38–51); and (v) the Mahwah Mansion is nominally owned by Taurus Fund, which is nominally indirectly owned by Mr. Je, a close associate of the Individual Debtor who serves as his "finance person", and is nominally managed by Mr. Barnett, the head of the Individual Debtor's security (Undisputed Facts 4(d)4(j), 5(c), 65–70). Hence, five of the six factors set forth in *LiButti* are met on the instant facts. 968 F. Supp. at 76; *see Dordevic*, 67 F.4th at 381.

Moreover, the Taurus Parties' argument that the Individual Debtor cannot be the beneficial owner of the Mahwah Mansion because he is a thief is unavailing. The Individual Debtor promoted G Club and falsely induced G Club members into parting with their money on the belief they were obtaining concierge services. (Undisputed Facts 5(a)–5(b), 39–47.) He then used the monies to buy the Mahwah Mansion for his personal benefit. (Undisputed Facts 38, 48–54; *see* Undisputed Facts 6–37, 48–64.) Where, as here, property is voluntarily parted with under false pretenses or fraudulent inducement, such property or its proceeds *is* the property of the perpetrator of that scheme and becomes property of a bankruptcy estate upon the filing of a bankruptcy petition. *Roseman Fam., LLC v. Picard*, 395 F. App'x 776, 769 (2d Cir. 2010) (comparing facts of the Madoff Ponzi scheme to those in *Kitchen v. Boyd (In re Newpower)*, 233 F.3d 922 (6th Cir. 2000) where conversion or embezzlement occurred); *In re Dreier LLP*, No. 08-15051-SMB, 2016 WL 3920358, at *5 n. 4 (S.D.N.Y. July 15, 2016) (distinguishing *Tedesco v. Mishkin (In re Mishkin)*, 138 B.R. 410 (Bankr. S.D.N.Y. 1992), which involved converted

property)), *aff'd by* 683 F. App'x 78 (2d Cir. 2017); *In re Dreier LLP*, 429 B.R. 112, 136 (Bankr. S.D.N.Y. 2010), *aff'd by* No. 10 CIV 4758 DAB, 2010 WL 3835179 (S.D.N.Y. Sept. 10, 2010).

Accordingly, the Court concludes the Trustee is entitled to a judgment as a matter of law that the Individual Debtor beneficially owns the Mahwah Mansion and the Taurus Parties are required to deliver the same to the Trustee for the benefit of the Individual Debtor's bankruptcy estate.

### C.    Beneficial Ownership and *Alter Ego* Status of Taurus Fund

With respect to his second and third claims, the Trustee argues (i) the only purpose of Taurus Fund is to hold the Mahwah Mansion, which the Individual Debtor beneficially owns; (ii) the Individual Debtor controlled Taurus Fund through his agents; (iii) Taurus Fund generates no independent income and was only ephemerally capitalized to pay its invoices through transfers from other entities related to the Individual Debtor; and (iv) Taurus Fund was occasionally used by the Individual Debtor to pay his invoices unrelated to the Mahwah Mansion.  For these reasons, the Trustee asserts, Taurus Fund is beneficially owned by, and the *alter ego* of, the Individual Debtor.  The Taurus Parties advance no arguments in addition to the arguments discussed in the preceding sections.

### 1.    Beneficial Ownership

Nevada law recognizes beneficial ownership of corporate entities.  *See, e.g.*, NEV. REV. STAT. § 92A.440.  However, the Court has not identified any cases applying Nevada law setting forth elements for determining when a legal owner is in fact a nominee for another party seeking to avoid liability.  Accordingly, the Court will apply the same federal elements as in the preceding section: "(1) whether inadequate or no consideration was paid by the nominee; (2) whether the property was placed in the nominee's name in anticipation of a lawsuit or other

liability while the transferor remains in control of the property; (3) whether there is a close relationship between the nominee and the transferor; (4) whether they failed to record the conveyance; (5) whether the transferor retains possession; and (6) whether the transferor continues to enjoy the benefits of the transferred property." *LiButti*, 968 F. Supp. at 76; *see Dordevic*, 67 F.4th at 381.

The Court concludes from these undisputed facts that the Individual Debtor beneficially owns Taurus Fund.  *See Dordevic*, 67 F.4th at 381; *LiButti*, 968 F. Supp. at 76.  Taurus Fund was created on the eve of bankruptcy while the Individual Debtor was subject to collection activity by his creditors (Undisputed Fact 1) solely to hold an asset, the Mahwah Mansion (Undisputed Facts 21, 26–27), for which no consideration was paid by Taurus Management, Hamilton Opportunity Fund, or Mr. Je, the nominal direct and indirect owners of Taurus Fund (*see, generally*, Undisputed Facts 38–51, 65).  Taurus Fund is nominally owned and managed by close associates of the Individual Debtor, Mr. Je (Undisputed Facts 4(d), 44–45, 65) and Mr. Barnett (Undisputed Facts 66–70).  At the same time, as discussed at length above, the Individual Debtor maintains possession and control of Taurus Fund's principal asset, the Mahwah Mansion, as if he were the title owner.  As with the Mahwah Mansion, five of the six *LiButti* factors are met on the instant facts.  *LiButti*, 968 F. Supp. at 76; *see Dordevic*, 67 F.4th at 381.

Accordingly, the Court concludes the Trustee is entitled to a judgment as a matter of law declaring Taurus Fund is beneficially owned by the Individual Debtor and requiring delivery of any membership interests in Taurus Fund to the Trustee for the benefit of the Individual Debtor's bankruptcy estate.

2.     *Alter ego*

Nevada law recognizes reverse veil-piercing where "the particular facts and equities show the existence of an alter ego relationship and require that the corporate fiction be ignored so that justice may be promoted", such as where a "controlling party uses the controlled entity to hide assets or secretly to conduct business to avoid the pre-existing liability of the controlling party." *Loomis*, 8 P.3d at 846 (citing *Select Creations, Inc. v. Paliafito Am., Inc.*, 852 F. Supp. 740, 774 (E.D. Wis. 1994)). Under Nevada law there are three elements of *alter ego*:

> (1) the corporation must be influenced and governed by the person asserted to be the alter ego; (2) there must be such unity of interest and ownership that one is inseparable from the other; and (3) the facts must be such that adherence to the corporate fiction of a separate entity would, under the circumstances, sanction fraud or promote injustice.

*Polaris Indus. Corp. v. Kaplan*, 747 P.2d 884, 886 (Nev. 1987). This test has been codified. NEV. REV. STAT. § 78.747 (2023). "Some factors to be considered when determining if a unity exists in an alter ego analysis include, but are not limited to, commingling of funds, undercapitalization, unauthorized diversion of funds, treatment of corporate assets as the individual's own, and failure to observe corporate formalities." *Lorenz v. Beltio, Ltd.*, 963 P.2d 488, 497 (Nev. 1998) (citing *Polaris Indus.*, 747 P.2d at 887). "No one of these factors alone is determinative to apply the alter ego doctrine." *Lorenz*, 963 P.2d at 497.

Based on applicable case law, the Court concludes from the undisputed facts that Taurus Fund is an *alter ego* of the Individual Debtor because all three elements are met. *See Polaris Indus.*, 747 P.2d at 886. As to the first two elements, the Court concludes Individual Debtor governs Taurus Fund and there is such a unity of interest between the Individual Debtor and Taurus Fund that they are inseparable. The factors set forth in *Lorenz* support this conclusion. 963 P.2d at 497. First, as discussed in preceding sections, the Individual Debtor treated Taurus Fund's principal asset, the Mahwah Mansion, as his own. Second, corporate formalities were not

63

observed.  For example, unbeknownst to Mr. Barnett, he was ostensibly a manager of Taurus Fund while he continued in his role providing security (and other) services for the Individual Debtor, such as holding title to motorcycles for the Individual Debtor and purchasing other goods for him.  (Undisputed Facts 66–70.)  Similarly, the manager of the Mahwah Mansion, Mr. Jing, was a personal assistant of the Individual Debtor described by Mr. Barnett as an "indenture[d] servant" (Undisputed Facts 53–54), and the manager of construction at the Mahwah Mansion was Mr. Cao, the boyfriend of the Individual Debtor's daughter who referred to the Individual Debtor as "dad" (Undisputed Facts 4(b), 31).  Third, Taurus Fund was only capitalized when comingled funds from other entities associated with the Individual Debtor transited through it to pay invoices.  (*See* Undisputed Facts 38–51.)  Fourth, funds were diverted to pay invoices of ostensibly unrelated entities associated with the Individual Debtor without corporate authority.  (Undisputed Fact 71.)

As to the third element, the Court concludes that adherence to the corporate fiction of any separation between Taurus Fund and the Individual Debtor would sanction fraud or promote injustice.  Taurus Fund's corporate form serves to hinder, delay, or defraud the Individual Debtor's creditors by shielding his assets from collection activity.  (Undisputed Fact 1.)  Moreover, Taurus Fund was created after PAX had obtained a judgment against the Individual Debtor and were seeking to collect on, among other things, his personal residence at the Sherry-Netherland Hotel held in the name of another corporate entity associated with him.  *See Loomis*, 8 P.3d at 846.

Accordingly, the Court concludes the Trustee is additionally entitled to a judgment as a matter of law declaring Taurus Fund is the *alter ego* of the Individual Debtor and requiring

delivery of Taurus Fund's assets to the Trustee for the benefit of the Individual Debtor's bankruptcy estate.

## VII.    CONCLUSION AND ORDER

Contrary to the Taurus Parties' contention that no facts support summary judgment, the Trustee has established a thorough record of undisputed facts.  The Trustee has met his burden. *Celotex Corp.*, 477 U.S. at 323.  Faced with the Trustee's factual material, the Taurus Parties barely contest any of the Trustee's asserted undisputed fact and have failed to put forward factual material demonstrating a genuine dispute of material fact.  *Matsushita Elec. Indus.*, 475 U.S. at 586; *see* D. Conn. L. Civ. R. 56(a)(3).  The Taurus Parties have been given ample opportunity to put forward factual material – more than the 90 days they initially requested (*compare* ECF No. 77 *with* ECF No. 99), including an opportunity to put forward factual material *after* the hearing on summary judgment despite unconvincing arguments regarding prejudice to their discovery efforts (*see* ECF No. 155).  *See Celotex Corp.*, 477 U.S. at 322–23.  Instead, the Taurus Parties have relied on meritless legal arguments and attempted to conflate the matters and parties presently before the Court with those in the Criminal Action, confusing the indictment with the Trustee's complaint and this adversary proceeding with the likely criminal forfeiture of the Individual Debtor's assets.

Summary judgment is entirely appropriate in this adversary proceeding.  There is no "genuine, triable issue of material fact" and proceeding to trial in this adversary proceeding would be dilatory and wasteful.  *Celotex Corp.*, 477 U.S. at 327.  For the reasons stated above, it is clear on the undisputed factual record that the Mahwah Mansion is the Individual Debtor's residence and property of his bankruptcy estate.  Accordingly, it is hereby

**ORDERED:**  The Motion for Summary Judgment (ECF No. 124) is **GRANTED** as to all claims in the complaint.  On or before July 21, 2025, the parties shall jointly submit a form of judgment consistent with this Opinion and Order; and it is further

**ORDERED:**  The documents submitted in support of, or in opposition to, the Motion for Summary Judgment are unsealed to the extent necessary to publish this Opinion.  Except as provided herein, the Sealing Orders (ECF Nos. 16, 90, 130) remain in full force and effect absent further order of the Court.

Dated at Bridgeport, Connecticut this 7th day of July, 2025.

Julie A. Manning
United States Bankruptcy Judge
District of Connecticut